TWELFTH-ST. MARKET CO. v. P. & R. TERMINAL R. CO.

FARMERS' MARKET CO. v. P. & R. TERMINAL R. CO.

APPEALS BY PLAINTIFFS FROM THE COURT OF COMMON PLEAS NO. 4 OF PHILADELPHIA COUNTY.

Argued May 18, 1891—Decided May 25, 1891.
[To be reported.]

1. The test whether property of a corporation is held for a public use, so that it cannot be appropriated by another corporation, under the right of eminent domain, without express or necessarily implied legislative authority, is the inquiry whether or not a public trust is imposed upon the property; whether the public has a legal right to the use which cannot be gainsaid or withdrawn at the owner's pleasure.

2. A company incorporated to build and maintain a market-house, on property to be acquired by purchase, and authorized to rent the stalls therein on such terms and to such persons as its managers may determine, with full power to lease or sell the property acquired for that purpose and to quit the business at its own pleasure, is in every legal sense a mere private business corporation.

3. The market-house and land of such corporation, so held, is not appropriated to public use in such a sense as that it cannot be taken by a rail-

road company, incorporated under the act of April 4, 1868, P. L. 62, for a railroad station, even though by the statute incorporating such company its purpose was declared to be the maintenance of buildings " to be appropriated and used as a public market-house."

4. The charter of incorporation of a regularly incorporated company cannot be called in question or assailed in any merely collateral suit affecting the rights of the corporation, such as a bill for an injunction to restrain the exercise of powers embraced within its charter, filed by a private suitor: such a collateral attack is unauthorized by act of June 19, 1871, P. L. 1361.

5. It has been the universal practice, under the act of April 9, 1856, P. L. 288, to designate a fixed sum as a penalty in bonds securing compensation for property taken under the right of eminent domain. From the order of the Court of Common Pleas approving such a bond as adequate in amount and executed by sufficient sureties, there is no appeal to the Supreme Court.

Before PAXSON, C. J., STERRETT, GREEN, CLARK, WILLIAMS, McCOLLUM and MITCHELL, JJ.

Nos. 51, 52, 57, 58 July Term 1891, Sup. Ct.; court below, Nos. 583, 584 March Term 1891, C. P. No. 4.

On April 2, 1891, the Twelfth-Street Market Company filed a bill in equity against the Philadelphia & Reading Terminal Railroad Company, praying for an injunction to restrain the defendant from appropriating, under the power of eminent domain, for the purpose of locating and constructing thereon its terminal sidings, depots, warehouses, etc., a lot of ground and market-house on the northeast corner of Twelfth and Market streets, Philadelphia, owned by the plaintiff. On the same day, the Farmers' Market Company, owner of a market-house adjoining the above on the east, filed a similar bill against the same defendant.

To the same numbers and terms the Philadelphia & Reading Terminal Railroad Company filed petitions praying for the approval of bonds, tendered by it to said market companies, respectively, to secure payment of compensation for the appropriation of their said several properties. The cases came before the court below for hearing upon motions for preliminary injunctions against the railroad company, in accordance with the prayers of the bill filed, and upon the applications of the railroad company for the approval of the bonds.

The Farmers' Market Company was incorporated by the special act of March 19, 1859, P. L. 250.

### Statement of Facts.

Section 1 of that act provided that certain persons and their associates "shall be and they are hereby declared to be constituted a body politic or corporate, by the style of the Farmers' Market Company, to have perpetual succession, to be capable in law of suing and being sued, to have a common seal and the same to alter and renew at pleasure, and to have, hold, receive, enjoy and take in fee-simple or upon ground-rent, such real or also such personal estate as may by them be deemed necessary and proper for the ownership, and for the construction and for the proper use and management and maintenance of a market-house in the city of Philadelphia, and for the accommodation and use of any parties who may be desirous of renting and occupying the same, with full power to sell, mortgage and create the necessary ground-rent deeds or convey the said real or personal estate; provided, that the market-house, the erection of which is authorized in this act, shall be completed within three years from the time of the approval thereof, otherwise this act shall be void and the privileges conferred therein forfeited."

Section 2 provided: "That the object and purpose of said corporation shall be to erect and maintain suitable building or buildings and stalls, with all other things necessary for the use thereof, at any place within the limits of the city of Philadelphia, the same to be appropriated and used as a public market-house, for the sale and vending of meats and vegetables, and all other kinds of victuals and provisions whatever; the said market-building, the stalls, or any one or more or all of the same, to be leased, rented or disposed of in such manner and upon such terms and conditions as the managers shall determine : provided, that this act shall not be construed to prohibit persons renting stalls in said market, who may send or carry the produce of their farms to market, from selling or exposing for sale, beef, mutton, veal, pork and poultry, in such quantities as they may desire, which may have been slaughtered on their farms, or butter or cheese, or other articles manufactured or produced thereon for market."

The Twelfth-Street Market Company was incorporated by act of April 6, 1864, P. L. 282, whereby it was provided that said company should be subject to all the restrictions, and have all the powers, privileges and immunities conferred in said act

to incorporate the Farmers' Market Company.    The respective
market-houses of said companies were erected by them respec-
tively within three years after their incorporation, and have
since been used for the purposes specified in their charters.

The defendant railroad company was incorporated under the
act of April 4, 1868, P. L. 62, and its supplement of May 31,
1887, P. L. 275, for the purpose of constructing, maintaining
and operating an elevated railroad " from a point on the line of
the railroad of the Philadelphia, Germantown & Norristown
Railroad Company, between Sixteenth street and Ninth street
and Columbia Avenue, in the city of Philadelphia, to a point
in the Ninth ward of the city of Philadelphia."

The bills in equity, as amended, charged that the appropria-
tion of the plaintiffs' market-houses by the defendant company
would interfere with and destroy the use of said premises by
the public as and for public markets, to which they were di-
rected by the plaintiffs' charters to be appropriated, and would
involve the destruction of the plaintiffs' franchises to maintain
public markets in the city of Philadelphia, as their charter
powers would not extend to the erection of other market-houses,
upon new sites, after the expiration of three years from their
incorporation ; that the act of April 4, 1868, conferred no right
thus to destroy the plaintiffs' franchises, unless in case of act-
ual necessity, which did not exist in this case ; that the defen-
dant company was not organized in good faith for the purpose
of constructing, maintaining and operating a railroad under the
general railroad law, but was a mere creation of the Philadel-
phia & Reading Railroad Company, organized to provide for
the latter company terminal facilities, in the centre of the city,
which it was unable to construct itself, under its charter, with-
out subjecting itself to all the provisions of the constitution ;
and that the bonds tendered to the plaintiffs by the defendant
were inadequate and insufficient in amount to cover the loss or
damage which would be caused by the taking of said real es-
tate.    Numerous affidavits, in support and contradiction of
these averments, were presented to the court at the hearing.

After argument, the court, THAYER, P. J., on May 2, 1891,
filed the following opinion and decree :

The right of eminent domain is the right of a sovereign state,

Opinion of Court below.

to take private property for public use, in order to promote the general welfare. It is called eminent domain, because it is superior to all private rights, and is an exercise of the sovereign authority which of necessity resides in all governments for the common benefit and welfare of their citizens. It was assumed by the framers of the constitution to be a right necessarily inherent in every sovereign state. Accordingly, they did not put into the constitution any express grant of such power to the legislature, while they took care to prohibit by express words any limitation to its exercise which should exempt corporations from its applications to their property, in common with that of individual persons. Article XVI., § 3, declares: " The exercise of the right of eminent domain shall never be abridged, or so construed as to prevent the general assembly from taking the property and franchises of incorporated companies and subjecting them to public use, the same as the property of individuals." If this power which resides in the state is a great power, it cannot be denied that it is also a necessary power. If it may seem in one aspect of it to be a despotic power, it cannot be denied that it is at the same time a beneficent power and absolutely essential to the public welfare. Without it, a road could not be opened, a railroad or telegraph line constucted, a canal dug, a bridge built, a new street laid out or an old one altered, and all public improvements would come to a stand-still. It oppresses no one, for its exercise is always accompanied by adequate and full compensation. It is guarded by just restrictions, and its abuse is prevented by adequate limitations.

This power the state, as it had the right to do, has delegated to the defendants in these cases, who were incorporated under the general railroad law of April 4, 1868, P. L. 62. By § 5 of that act, they are empowered to exercise all the rights, powers and privileges of the act regulating railroad companies, approved February 19, 1849, P. L. 79, by § 10 of which they are authorized to locate such route for their railroad as they may deem expedient, not, however, passing through any burying-ground, or place of public worship, or any dwelling-house in the occupancy of the owner thereof, without his consent, and to enter upon and into, and occupy all land on which said railroad, or depots, warehouses, offices, toll-houses, engine and water stations, or other buildings before mentioned, may be

located, or which may be necessary or convenient for the erection of the same; provided, that before such company shall enter upon or take possession of such lands they shall make ample compensation to the owner thereof, or tender adequate security therefor.

This, then, is the warrant from the state, by virtue of which the defendants propose to take the land belonging to the several plaintiffs in these cases, for the purpose of making the same the terminus of their line and erecting thereon their depot; the city of Philadelphia, so far as its consent may have been necessary, having, by its appointed authorities, also given its consent thereto.

The plaintiffs allege that their property cannot be lawfully taken without their consent, because they are corporations with charters which empower them to build, hold and maintain market-houses for the public accommodation; that this use of their property is a public use; and that, in accordance with the established law upon this subject, one corporation cannot take, by the right of eminent domain, the property and franchise of another corporation held for public uses, without an express authority from the legislature so to do, or an authority necessarily to be implied from the grant to them of their powers, and arising out of the absolute necessity inherent in the grant and not created by themselves.

So far as relates to that portion of the objection made by the plaintiffs to the proceedings of the defendants, which rests upon the corporate character of the plaintiffs and the privileges secured to them by their charters, it is unnecessary for me to enter into any discussion, for the reason that it is too well settled to admit of debate that under the right of eminent domain not only the lands of a corporation may be taken for such a public use as a railroad company, but their franchise also. It would be a mere affectation of industry for me to parade the many cases decided in Pennsylvania and the other states of the Union which affirm this proposition, especially in view of the express words of the constitution already quoted, which subject all franchises, as well as other property of corporations, to the exercise of this right. It must, however, be conceded that the plaintiffs are right in declaring that neither the franchise of a corporation existing for a public use, in the legal

Opinion of Court below.

and proper sense of the words, or the lands which are necessary for the enjoyment of such public use, can be taken under the delegated power of eminent domain, without a clear and express authority from the legislature to that effect, or an authority necessarily implied from the grant.*

It must further be conceded that there is not in the act of February 19, 1849, any express grant of authority to take lands held by other corporations for public uses, nor have I been convinced, notwithstanding the ingenious argument made by the defendants' counsel, that the facts in the present cases show any such absolute necessity of taking the plaintiffs' land as would give rise to an implied authority, such a necessity as arises out of the nature of the case and is not of the defendants' own creation. On the other hand, nothing can be plainer than that it is not necessary for the defendants to show any such absolute necessity for the taking, unless the plaintiffs have made good their claims to be corporations existing for public uses, within the true legal meaning of those words.

Now the meaning of these words, " for public use," has been frequently determined in the cases in which the question of the validity of the grant of the right of eminent domain has arisen, where it was necessary to decide whether the purpose for which the property was to be taken was for a " public use." Clearly, the words do not mean that every use is a public use from which the public may incidentally and temporarily derive an advantage, or benefit, or convenience, during the pleasure of the owner of the property, and from which they may be excluded at the mere caprice of the owner. If this definition were accepted, any man's property might be taken upon the shallowest pretence of a public use. The test whether a use is public or not is whether a public trust is imposed upon the property, whether the public has a legal right to the use, which cannot be gainsaid, or denied, or withdrawn, at the pleasure of the owner. A particular enterprise, palpably for private advantage, will not become a public use because of the theoretical right of the public to use it. The question is, whether the

* See Penna. R. Co.'s App., 93 Pa. 150; Packer v. Railroad Co., 19 Pa. 211; Commonwealth v. Railroad Co., 27 Pa. 339; Cake v. Railroad Co., 87 Pa. 307; Pittsb. Junction R. Co.'s App., 122 Pa. 511; Sharon R. Co.'s App., 122 Pa. 533; Groff's App., 128 Pa. 621.

public have a right to the use. The general public must have
a definite and fixed use of the property, a use independent of
the will of the private person or corporation in whom the title
is vested; a public use which cannot be defeated by the pri-
vate owner, but which is guarded and controlled by the law.
The true criterion by which to judge of the character of the
use is whether the public may enjoy it by right, or only by
permission. The test is, not what the corporation owning the
land may choose to do, but what under the law it must do,
and whether a public trust is impressed on the land. A fran-
chise for such a public use cannot be granted away. The
question of a public use is not affected by the agency employed.
It is no more of a public use for being held by a corporation.
To constitute a public use, the property must be under the
control of the public, or of public agencies, or the public must
have a right to the use.*

Let us now turn to a brief examination of the nature of the
rights possessed by the market companies who are plaintiffs in
these cases.

The Farmers' Market Company was incorporated by an act
passed March 19, 1859, P. L. 250. By the first section they
were empowered to acquire such real or personal estate as they
might deem necessary for the maintenance of a market-house
in the city of Philadelphia, with full power to sell, mortgage
or convey the same at their pleasure. Section 2 declares the
purpose of the corporation to be to erect and maintain a build-
ing and stalls to be used as a public market-house, the same to
be leased, rented, or disposed of on such terms and conditions
as the managers should determine. By § 3, the capital stock
was not to exceed two hundred fifty thousand dollars, in shares
of fifty dollars each; and the affairs of the company, by § 4,
were to be managed by a board of nine managers elected by
the stockholders. The Twelfth-Street Market Company, by
an act passed April 6, 1864, P. L. 282, was incorporated " with

---

* Mills on Em. Dom., §§ 11, 14; New York Ry. Co., 99 N. Y. 12; De
Camp v. Railroad Co., 47 N. J. L. 43; Concord R. Co. v. Greeley, 17 N.
H. 47; Bloodgood v. Railroad Co., 18 Wend. 9; Brown v. Beatty, 34
Miss. 227; Varner v. Martin, 21 W. Va. 534; Canal Co. v. Bonham, 9
W. & S. 27; Wood v. Railroad Co., 8 Phila. 94; Thomas v. Railroad Co.,
101 U. S. 71; Lewis on Em. Dom., §§ 160, 164, n. 6.

all the powers, privileges and immunities contained in the act incorporating the Farmers' Market Company." Its capital stock was not to exceed three hundred thousand dollars in shares of fifty dollars each.

The charters of the two companies were therefore in all essential respects identical. They are both private corporations, authorized to build houses and stalls to be used as public market-houses, for the sale of meats, vegetables, victuals and provisions, with the right to rent the stalls for whatever prices they may choose, or to sell out and quit the business whenever they please. We may ask, then, as the Supreme Court pertinently asked in Girard Storage Co. v. Southwark Foundry Co., 105 Pa. 251 : " What rights have the public in and upon these properties other than what it would have did that property belong to a private individual ? " " We understand very clearly," the court goes on to say, " the relation of a turnpike road, canal, and railroad, to the public. The people of the commonwealth have the right-of-way over them, which right when occasion requires may be exercised regardless of the will of the corporations owning them. They are highways ; and the companies operating them have the right of eminent domain conferred upon them only because of this direct interest which the public has in these methods of transit. But in the works of the corporation defendant the community at large has no other or further interest than it has in the storehouses of private individuals. It may receive the grain of one person and refuse that of another, or it may, at its own will, suspend operations and shut out the public altogether. Its organization is all that it has received from the public ; beyond this, the public has no special interest in it, and when this organization disappears there is nothing left of a public character, or anything over which the commonwealth has control." Every word of this is as applicable to the corporations plaintiff in these cases as it was to the Girard Storage Co. Corporations are divided, said THOMPSON, C. J., in Foster v. Fowler, 60 Pa. 30, into public and private corporations ; " that is, into those which are agencies of the public and directly affecting it, and those which only affect it indirectly. . . . ." The public is directly interested in the results to be produced by the former, and the use of them cannot be disturbed by the seizure of the property

Opinion of Court below.

essential to their operations by creditors. They must recover their debts by sequestering their earnings, allowing them to progress with their undertaking, to accommodate the public. This direct benefit to and accommodation of the public very clearly distinguishes this class of corporations from private corporations, in which the public is but indirectly interested. Whether they progress or cease, the public is not directly affected.

To apply this reasoning to the cases now in hand. In a market established, managed, and controlled by the municipal authorities, and governed by municipal laws, there may be no doubt a public use. Such were the markets formerly maintained by the city in Market street and other streets. But what legal interest has the public in the plaintiffs' market-houses? Is not their property entirely under their own control? May they not rent their stalls to whom they please, and refuse them to whom they please? And may they not, by the express words of their charter, rent, or sell the whole building when and to whom they please? The second section of their charter declares that they may. Where is there any trace of a public trust impressed upon their property? Or, where are there any rights of the public which can be enforced against them? May they not be sold out by the sheriff at any time upon a creditor's execution, like any private individual? The answers which must be given to these questions show, it appears to me, conclusively, that the plaintiffs are but private corporations owning property impressed with no public trust; that they are engaged in a purely private business, which is wholly under their own control, in which the community has no public rights, and with which the public has no right to interfere. It is impossible that corporations which exist solely for their own purposes and profit, and which are governed only by their own interests and their own will, and over which the public can by no possibility exercise any control, can be regarded as corporations existing for public uses within the legal meaning of those words.

But it is said the plaintiffs have a franchise. Well, if they have, the franchise, as I have already shown, may be taken by virtue of the right of eminent domain, unless it is a franchise existing for public uses. If it is a franchise of that character,

Opinion of·Court below.

it cannot be taken without an express legislative grant or in virtue of an implied power arising out of an absolute necessity. But what is their franchise ?

A franchise, in England, is a branch of the king's prerogative subsisting in the hands of a subject. It is derived from the crown, and must arise from the king's grant, or by prescription, which presupposes a royal grant. In this country, it may be defined as a privilege vested in certain persons by grant from the sovereign authority in the state, to exercise powers, or to perform acts, which, without such grant, they could not do or perform. A franchise is jus publicum and necessarily exclusive in its nature : 3 Kent Com., 573. What are the franchises possessed by the plaintiffs ? They have the franchise of being a corporation. As such, they have a right in their corporate capacity to have and maintain a market-house. There is plainly nothing exclusive in that. Any person or association of persons has a right to do the same thing without any grant from the state. Every green-grocer and provision dealer in the city is engaged in the same business ; that is, he keeps a market-house. Unlike the plaintiffs, however, he not only keeps the market-house, but he himself sells the provisions which are sold there. The plaintiffs are engaged in maintaining a market-house in their collective capacity, under the cover of a charter. Any person may do the same thing without a charter. There is nothing in the nature of a franchise in the business which they carry on, for any one who chooses may carry on the same business. Their franchise consists solely in being a corporation, and carrying on their business in a corporate capacity. When the defendants take their market-house under .the delegated power of eminent domain, they do not take their charter or touch their franchise of being a corporation, which is really the sum total of the franchises which they possess. Even if the taking of their property involved the loss of their charters, as their counsel argue, a proposition to which I by no means assent, they could obtain a new one, as any other person may, under the provisions of the act of 1874, for the mere asking. What is the commercial value of a franchise which any one who chooses to ask for may obtain for nothing ?

 · On the argument, much was said by the plaintiffs of the importance of public markets ; and the case was argued as if the

right to maintain a market-house or to hold a market in Pennsylvania was a prerogative vested exclusively in the state, and one which no one can exercise without a grant from the commonwealth. At common law, in England, the establishment of public markets was no doubt a part of the king's prerogative, and no one could set up a market without a grant from him. Such grants were doubtless at one time fruitful sources of revenue to the royal exchequer. Their establishment was, as Blackstone says, " a part of the economies of domestic polity, which, considering the kingdom as a large family and the king as master of it, he had the right to dispose of as he pleased :" 1 Bl. Com., 274. These English markets, with their stewards, their tolls, their courts of pie-poudre in which all disputes originating in them must be decided before the setting of the sun, their special privileges and peculiar customs, constituted an important feature in the domestic economy of every English neighborhood. They were a part of the royal prerogative, undoubtedly, but they never crossed the seas to this country in that capacity, any more than did the right to all royal fish, such as the whale and the sturgeon, the right to corodies, to wrecks, to treasure trove, or to bona waviata. Our ancestors, when they transplanted on these shores the principles of English freedom, left behind them all royal prerogatives except such as were to be, in the hands of the people, the necessary instruments of the free government which they here established. I am not aware that it has ever been supposed or maintained in Pennsylvania that no man or association of men could set up a market-house or establish a market without a grant from the legislature.

The right to be a corporation and to carry on any business in a corporate capacity is a right derived from the commonwealth. The right to maintain a market-house or to carry on the business of a market is not a right so derived, but is a right belonging to all citizens of the commonwealth alike and which any citizen or any association of citizens may exercise without any grant or any warrant whatever from the commonwealth. A private company incorporated for that business is a private corporation, as much so as a private company engaged in the manufacture of goods, in insurance, in the keeping of a hotel, or the prosecution of any other business. They are not the less private corporations because they incidentally afford a con-

venience to the public.   In Turnpike Company v. Wallace, 8
W. 316, it was held that a company in which the state held a
hundred and seventy-one thousand dollars of the stock, and
individuals sixty-two thousand dollars only, was a private, not
a public corporation.   If the foundation be private, the corpo-
ration is private, although the uses in a certain sense may be
called public.   The mere act of being incorporated cannot
change a corporation from a private to a public one.   " To
hold a corporation to be public because the charity is public,
would," says Chancellor Kent, " be to confound the popular
with the strictly legal sense of terms, and to jar with the whole
current of decisions since the time of Lord COKE: 2 Kent
Com., *276.

Tried by any tests which can properly be applied to them,
the plaintiffs are corporations.   They have not a single feature
belonging to a public corporation.   They maintain the market-
houses they own, or not, at their option.   They can sell them
or rent them.   Their property may be taken in execution, and
sold, like that of any individual.   They are not armed with any
portion of the right of eminent domain.   They owe no duty to
the public which they are bound to fulfil, or which can be en-
forced by the public.   The public has no legal rights of any
nature in their property, nor any use therein which is recog-
nized by law.   They are not under any public authority, or
subject to any public control; nor have the public any use in
their property or any franchise which is secured by any law, or
which can be enforced by any remedy.   They are not liable to
any public supervision, nor can they be made to respond to any
public demands.

Being, therefore, in every legal sense, mere private business
corporations, with no public functions which they can be com-
pelled to perform, and subject to no public use which can be
enforced against them, there is nothing in their constitution,
their nature, or their relations to the state or to the public,
which exempts their property from the exercise of the sovereign
right of eminent domain.   They stand in that respect upon the
same level with every citizen in the commonwealth, and have
no greater rights in this regard than any private individual
whose property is needed by the state for public purposes.

With regard to the numerous amendments which have been

made to the plaintiff's bill, and to the injunction affidavits and other affidavits which have been filed in aid thereof, since this cause was argued before us, they appear to us to have been intended to alter the whole character of the present proceeding, and to convert it into a quo warranto proceeding against the defendant, or to make it subserve the office of a scire facias to repeal the defendant's charter. It is only necessary to say that this cannot be done, either under the act of 1871, or under any other law known to this state; and this has been so often determined that it is quite unnecessary to refer to the cases upon the subject. The charter of incorporation of a regularly incorporated company cannot be called in question or assailed in any merely collateral suit affecting the rights of the corporation. The machinery for that purpose can only be set in motion by the state or by its authorized public officers.

The motion for an injunction is refused.

After a careful consideration of the bonds which have been offered by the Philadelphia & Reading Terminal company for our approval, we are of opinion that they are entirely sufficient. They are adequate in amount and the sureties are satisfactory.

—Thereupon the plaintiffs took the appeals at Nos. 51, 52 from the decrees refusing the motions for injunctions, assigning for error the refusal of said motions; and took the appeals at Nos. 57, 58 from the decrees approving the bonds filed, specifying that the court erred in approving said bonds because:

1. They did not appear to be signed by two sufficient sureties.*

2. They did not constitute adequate security.

3. By the mention of penal sums their amounts were limited below the values of the properties taken.

The two causes were argued together in the Supreme Court. In Nos. 51, 52, an agreement of counsel was filed, " that these appeals shall be heard and decided upon the merits of the cases, as if upon a hearing upon bill, answer, and testimony, for final decree." In Nos. 57, 58, on May 15, 1891, rules upon the appellants were taken to show cause why the appeals should not be dismissed and the writs of certiorari quashed.

---

* The bond to the Twelfth-St. Market Co. was in the sum of $600,000; that to the Farmers' Market Co. was in the sum of $800,000. Upon each bond there were three sureties.

Arguments.

*Mr. Benjamin P. Wilson* and *Mr. George Junkin* (with them *Mr. F. L. Wayland*), for the appellants :

1. The market-houses of the plaintiffs are, under their charters, held and appropriated for a public purpose, to wit, the holding of public markets under express legislative enactments. They cannot be taken, and the public franchises of the plaintiffs destroyed, except by legislative authority expressly conferred or necessarily implied : Northampton v. Ward, 1 Wils. 114 ; Richards v. Market Co., 23 L. J. Ch. 110 ; Wartman v. Philadelphia, 33 Pa. 209 ; Taggart v. Detroit, 22 Am. & Eng. Corp. Cas. 183 ; Application of Cooper, 28 Hun 515 ; Lewis on Em. Dom., §§ 163, 174, 272–276 ; Green's Brice's Ultra Vires, 371, note *a ;* Ketcham v. Buffalo, 14 N. Y. 356 ; Downshire v. O'Brien, L. R. 19 Ir. 389 ; Commonwealth v. Railroad Co., 27 Pa. 339 ; Penna. R. Co. v. Canal Commissioners, 21 Pa. 9 ; Head v. Insurance Co., 2 Cranch 127 ; Railroad Co. v. Harris, 12 Wall. 65 ; 2 Kent Com., 299 ; Petersburgh v. Metzker, 21 Ill. 205 ; Richmond R. Co. v. Railroad Co., 13 How. 71 ; Sedgwick on Stat. Law, 292 ; Second N. Bank v. Manufacturing Co., 13 W. N. 174 ; Edgewood Water Co. v. Water Co., 7 Pa. C. C. R. 476 ; Penna. R. Co.'s App., 93 Pa. 150 ; Pittsb. Junction R. Co.'s App., 122 Pa. 511 ; Sharon Ry. Co.'s App., 122 Pa. 533 ; Charles River Bridge Co. v. Bridge Co., 11 Pet. 420 ; Groff's App., 128 Pa. 621 ; Packer v. Railroad Co., 19 Pa. 211 ; New York R. Co. v. Gas Co., 63 N. Y. 326 ; Morris R. Co. v. Railroad Co., 31 N. J. L. 205 ; Oregon R. Co. v. Bailley, 3 Ore. 164 ; Mills on Em. Dom., § 46 ; City of Buffalo, 68 N. Y. 167 ; State v. Noyes, 47 Me. 189 ; Providence R. Co. v. Norwich, 138 Mass. 277 ; Housatonic R. Co. v. Railroad Co., 118 Mass. 391 ; Tuckahoe Can. Co. v. Railroad Co., 11 Leigh. 42 (36 Am. Dec. 374) ; Worcester R. Co. v. Commissioners, 118 Mass. 561 ; State v. Railroad Co., 35 N. J. L. 328 ; St. Louis R. Co. v. Blind Institution, 43 Ill. 303 ; Boston etc. R. Co., 53 N. Y. 574 ; Milwaukee etc. R. Co. v. Fairbault, 23 Minn. 167 ; St. Paul Union Depot Co. v. St. Paul, 30 Minn. 389 : Springfield v. Railroad Co., 4 Cush. 63 ; Boston etc. R. Co. v. Railroad Co., 124 Mass. 368 ; Little Miami etc. R. Co. v. Dayton, 23 Ohio 510 ; United States v. Bridge Co., 6 McLean 517 ; Barber v. Andover, 8 N. H. 398 ; Newburyport Turnp. Co. v. Railroad Co., 23 Pick. 326 ; Bos-

ton Water P. Co. v. Railroad Co., 23 Pick. 360; Baltimore Turnp. Co. v. Railway Co., 35 Md. 224 (6 Am. Rep. 397); Chicago etc. R. Co. v. Lake, 71 Ill. 333; Metropolitan etc. Ry. Co. v. Railway Co., 87 Ill. 317; New York etc. R. Co. v. Gas Co., 18 Sickels 326; Market St. Ry. Co. v. Railway Co., 30 Leg. Int. 154.

2. It is the duty of the court, under the act of June 19, 1871, P. L. 1361, to inquire whether or not there have been conferred upon the defendant the rights and franchises to do the acts from which the injury to the plaintiffs will result: Commonwealth v. Railroad Co., 24 Pa. 159; McCandless's App., 70 Pa. 210; Edgewood R. Co.'s App., 79 Pa. 257; Western Penna. R. Co.'s App., 104 Pa. 399; Sterling's App., 111 Pa. 35; Penna. R. Co.'s App., 116 Pa. 55; Dienelt v. Web Co., 133 Pa. 585; Hibernia Ins. Co. v. Transportation Co., 13 Fed. R. 516; Lejee v. Railway Co., 10 Phila. 362. Such rights and franchises have never been conferred upon the defendant. The general railroad laws do not authorize the incorporation of a company to build a railroad wholly within a city or town. Moreover, the defendant is not a "railroad company" within the meaning of the act of April 4, 1868, P. L. 62, but its road is a branch of the Philadelphia & Reading Railroad Company. It is the Philadelphia & Reading Railroad Company, using the defendant's charter as a mere cloak for the accomplishment of its own purposes, that is really seeking to construct the road here complained of. After unsuccessful efforts to secure permission of the city councils to the construction of it under the defendant's charter, the Philadelphia & Reading Railroad Company attempted to construct it, as a branch, under its own charter. It was decided in Philadelphia v. Railroad Co. (C. P.), 25 W. N. 320, that this could be done, but only under the act of May 31, 1887, P. L. 275, and so as to involve acceptance of the constitution. The efforts of the defendant to obtain municipal consent were then renewed, and finally succeeded. From these incontrovertible facts, it is clear that this road is but a branch of the Reading railroad, and that the proceeding to construct it under the defendant's charter is an unjustifiable evasion of the constitution. As to the bonds filed by the defendant company, the fixing of an amount in a condemnation bond, beyond which the sureties are not to be liable,

is unwarranted by the act of April 9, 1856, P. L. 288: Wadhams v. Railroad Co., 42 Pa. 303.

*Mr. John G. Johnson* and *Mr. Thomas Hart, Jr.,* for the appellee.

Among the authorities cited by counsel were: (1) As to the character of the plaintiffs' franchises and properties: South Reading Market-House Co. v. Berks Co., 11 W. N. 424; Carbon Iron Co. v. Carbon Co., 39 Pa. 251; Lackawanna I. & C. Co. v. Luzerne Co., 42 Pa. 424; Foster v. Fowler, 60 Pa. 27; 1 Wood's Railway Law, 683; Lewis on Em. Dom., §§ 159, 164, 274; New York etc. R. Co., 99 N. Y. 12; Girard Storage Co. v. Southwark Co., 105 Pa. 248; Pittsburgh v. Scott, 1 Pa. 309; Sharpless v. Philadelphia, 21 Pa. 147; Palairet's App., 67 Pa. 479; Hughes v. Farmers' Ass'n, 1 Phila. 338; Caldwell v. Alton, 33 Ill. 416; New Orleans v. Guillette, 14 La. Ann. 875; David v. New Orleans, 16 La. Ann. 404 (79 Am. Dec. 586); Gaul v. Cincinnati, 18 Ohio St. 563; Cooper's Application, 93 N. Y. 507; 2 Morawetz on Priv. Corp., § 923. (2) As to the implied power of the defendant to take property already devoted to public use: Phila. etc. R. Co. v. Railroad Co., 1 Montg. Co. R. 129 (16 Phila. 636); Brocket v. Railroad Co., 14 Pa. 241; Penna. R. Co.'s App., 116 Pa. 55. (3) As to questioning the charter rights of the defendant: Kishacoquillas Turnpike Co. v. McConaby, 16 S. & R. 140; Cleveland etc. R. Co. v. Speer, 56 Pa. 325; Lejee v. Railway Co., 10 Phila. 362; Western Penna. R. Co.'s App., 104 Pa. 399. (4) As to the construction of a railroad wholly within the limits of a city: Knickerbocker Ice Co. v. Railroad Cos., 15 Phila. 48; Volmer's App., 115 Pa. 166; Penna. R. Co.'s App., 116 Pa. 55; Long Branch Comm'rs v. Railroad Co., 2 Stew. 566; Nat. Docks Ry. Co. v. Railroad Co., 5 Stew. 755; Wiggins Ferry Co. v. Railway Co., 107 Ill. 450; as to the appeals from the approval of the bonds: Slocum's App., 12 W. N. 84; Getz v. Railroad Co., 1 Walk. 427.

## NOS. 51, 52.

PER CURIAM:

These were appeals from the refusal of the court below to issue preliminary injunctions restraining the Philadelphia &

Syllabus.

Reading Terminal Railroad Company from proceeding to condemn, under its right of eminent domain, the market-houses of the respective appellants for depot purposes. The order below was interlocutory, and in appeals from such orders it is not our practice to dispose of cases upon their merits. In these instances, however, the facts are before us as fully as they would be upon final hearing, and, as it is to the manifest interest of the parties to the controversy that their rights shall be settled, an agreement has been filed that we shall enter a final decree. It would be difficult to add anything profitably to the opinion of the learned president of the court below, and we adopt it as the opinion of this court.

> The decree is affirmed in each case, and the bill dismissed at the cost of the appellants.

### NOS. 57, 58.

PER CURIAM:

The learned court below has decided in each of the above cases that the bonds are adequate in amount and the sureties satisfactory. From that decision there is no appeal to this court: Slocum's App., 12 W. N. 84; Getz v. Railroad Co., 40 Leg. Int. 336 (1 Walk. 427). Objection was made at bar that the bonds designate a fixed sum as a penalty. This has been the universal practice under the act of 1856, and the affidavits submitted to the court below show that the bonds are amply sufficient to cover the damages.

> The writ of certiorari is quashed in each case.