# McLeod, Appellant, v. Central Normal School Association.

[Marked to be reported.]

*Corporations—Quasi public and private corporations.*

Private corporations in Pennsylvania are divided into two classes, (1) corporations which affect the public directly, and are quasi public, and (2) corporations which affect the public indirectly, and are, therefore, strictly private.

In order that a private corporation may be regarded as quasi public, it must exist directly for the public use; the corporate franchise must be such as is held in the nature of a public trust, and such that the public has standing to assert and enforce its right. If the public may assert a use by right, then the property of the corporation may be said to be in the direct use of the public at large, though under the control of private persons or of a corporation.

*Quasi public corporations—Mechanics' lien.*

The property of a quasi public corporation is not liable to a mechanics' lien.

*State normal schools—Mechanics' liens—Act of May 20, 1857.*

A normal school incorporated for the purpose of training teachers for public schools, and receiving recognition and aid from the the state under the act of May 20, 1857, P. L. 581, entitled " an act to provide for the due training of teachers for the common schools of the state," is not a quasi public corporation, and its property is subject to mechanics' liens.

Whilst normal schools are no doubt engaged in a most necessary and useful public work, and have been valuable auxiliaries in the education of the masses of the people, the mere fact that they have been incorporated for this particular purpose, and are actually engaged in this work, will

not of itself give them the essential qualities of a public corporation. Their charter is, in form and effect, that of a private corporation merely ; their work is but indirectly for the public use, and they must be answerable for their debts and engagements under the same forms of procedure and to the same extent as other private corporations and individuals. Per CLARK, J.

Argued March 17, 1891. Appeal, No. 69, Jan. T., 1891, by plaintiff, John McLeod, from order of C. P. Clinton Co., May T., 1890, No. 114, making absolute rule to strike off mechanics' lien. Before PAXSON, C. J., GREEN, CLARK, WILLIAMS, McCOLLUM and MITCHELL, JJ.

Scire facias sur mechanics' lien. Rule to strike off lien.

The facts appear by the opinion of the Supreme Court.

*Error assigned* was making rule absolute.

*A. F. Ryon* and *C. S. McCormick*, for appellant.—The state did not assume and maintain a supervisory control over the management of the school. The title to the property is in the corporation.

The mechanics' lien law applies to a church : Church v. Allison, 10 Pa. 416. A stable built and occupied by a passenger railroad company is liable to a mechanics' lien : McIlvain v. Hestonville & Mantua R. R., 5 Phila. 13.

A company incorporated to transact a general storage and elevator business, including the right to issue warehouse receipts, advance money, etc., is not a public corporation and its real estate used in the exercise of its franchise is not exempt from mechanics' liens : Girard Point Storage Co. v. Southwick Foundry Co., 105 Pa. 248.

By act of April 15, 1834, §§ 6 and 7, P. L. 538, the only way to collect a debt against a county or a township is by a writ of mandamus against the proper officers thereof, and by attachment following, if necessary. By act of 1854, § 20, P. L. 620, this law was extended to school districts.

A mechanics' lien could not be entered against a court house, a public schoolhouse nor against a borough lockup, etc., for debts are collected against these corporations only by a writ of mandamus to the proper officers thereof, to be followed by an attachment, if necessary ; and, in case of a mechanics' lien, the property was to be sold by a levari facias, and there could be no such writs in these cases. It would be against acts of as-

sembly in each and every case.   Where there can be no execution there can be, no action: Williams v. Controllers, 18 Pa. 275.   There can be no execution against a turnpike: Turnpike Co. v. Wallace, 8 Watts, 316.

See Foster & Co. v. Fowler & Co., 60 Pa. 30, for difference between public and private corporation.   See also Normal School v. Hauck, 2 W. N. 86.

*Seymour D. Ball,* for appellee.—This association in its object, creation, maintenance, control, regulation and management, is so far a state institution, so far a material part of the common school system of the state, that it must be held as a public corporation and is therefore excepted and shielded from ordinary execution process, under mechanics' liens, as provided by act of June 16, 1836, § 72.

OPINION BY MR. JUSTICE CLARK, filed February 6, 1893:

The questions raised by the assignments of error in this case arise upon a motion to strike off a mechanic's lien against the buildings of the Central Normal School Association of the state of Pennsylvania, situate in Lockhaven.   The lien was entered April 9, 1890, under the act of June 16, 1836, and its supplements, by John McLeod, a subcontractor, against the Normal School Association, as owner, and Charles H. Ferguson, as contractor and builder, for two thousand eight hundred perches of stone furnished, in pursuance of a contract to that effect, in the erection and construction of buildings designed for normal school purposes.   The Central Normal School is the state normal school for the eighth normal school district of Pennsylvania, and has been regularly recognized as such according to the provisions of the act of May 20, 1857, P. L. 581, entitled, " An act to provide for the due training of teachers for the common schools of the state."

The contention of the board of trustees is that although the Central Normal School is in form a private corporation acting under a charter from the court of common pleas of Clinton county, yet, as it has been recognized as a state normal school under the act of May 20, 1857, it exercises a certain public function delegated to it by the sovereignty of the state, directly in the public interest under the provisions of that act ; that the school is a public auxiliary to the government in the mainte-

nance and support of the system of common schools, and must be regarded and treated as a quasi public corporation, and that therefore a mechanic's lien is not valid in law against property essential to the operation of the school.

As the constitution, from the earliest years of our national independence, imposed upon the legislature the duty of providing by law for the establishment and maintenance of schools for the education of children throughout the commonwealth and especially the children of the poor, it was without doubt within the scope of the legislative power, in the maintenance of these schools, to provide a system of public schools for the education of common school teachers. In the constitution of 1776, chap. 2, § 14, it was provided as follows: "A school or schools shall be established in each county, by the legislature, for the convenient instruction of youth, with such salaries to the masters paid by the public as may enable them to instruct the youth at low prices." The constitution of 1790, article 7, § 1, imposed this duty in the words following: "The legislature shall, as soon as conveniently may be, provide by law for the establishment of schools throughout the state in such manner that the poor may be taught gratis." The convention of 1838 adopted and continued this provision without change or modification. In the present constitution, however, article 10, § 1, this obligation· is modified and extended as follows : " The general assembly shall provide for the maintenance and support of a thorough and efficient system of public schools, wherein all the children of this commonwealth above the age of six years may be educated ; and shall appropriate at least one million dollars each year for that purpose." The maintenance of the public schools under these constitutional provisions imposed an obligation to erect and maintain suitable buildings, to furnish conveniences and equipments reasonably necessary to promote the work of education, to provide and employ competent teachers and to do all the necessary things that the poor may be taught gratuitously, or, in the words of the present constitution, that the people may have a thorough and efficient system of public schools. The want of competent teachers was for many years and perhaps to some extent still is the principal defect in the system. The idea prevailed generally in this as well as in the other states that to make the public school

system a success, teachers should be specially fitted and pre-
pared for their work, by a study of pedagogics and of modern
and approved methods of teaching, in schools organized and
equipped for the purpose, and this gave rise to the act of
May 20, 1857. It would, doubtless, have been competent for
the legislature, in order to maintain a system of common schools
and to render it effectual for the purpose intended, to establish
schools for the training of teachers at the public expense, as
has been done in many of the states. The state of New York,
beginning about the year 1849, erected, equipped, and now
maintains at the public expense, ten normal schools, which,
under some restrictions, are free to all such persons, residing
within the state, as desire to become teachers trained for the
common schools of that state. The city of New York, in ad-
dition, maintains, at an annual public expense of over one hun-
dred thousand dollars, a normal college, with a large school of
practice attached for the education of female teachers. The
city of Philadelphia also supports a school for females, known
originally as the Philadelphia Model School, but now as the
Girls' Normal School; it was established by law as early as
1818 expressly as a teachers' school. It is the oldest school of
the kind in the country, and it is said that in buildings, equip-
ments, course of study, schools of practice, and methods of in-
struction, it is one of the best. All of these schools for teachers,
like our system of common schools, were founded directly in
the public interest and are maintained wholly out of the pub-
lic funds. Whether incorporated or not they are institutions
performing a public function, directly for the public use, in
the support of the system of public schools and in the diffusion
of knowledge among the people. They illustrate what the
state of Pennsylvania might have done, or had the power to
do, if that policy had been approved by the legislature.

The policy actually pursued, however, under the provisions
of the act of 1857, is somewhat different. The act, as we have
said, is entitled, "An act to provide for the due training of
teachers for the common schools of the state." It divides the
state into twelve districts, with provision for establishing but
one normal school in each; the schools to be established and
managed by private companies or corporations, composed of
contributors or stockholders; the pecuniary affairs to be man-

aged, and the general control exercised, by a board of trustees chosen by the company or corporators, who are to report annually to the school department. It prescribes certain requisites for recognition by the state: the character and equipment of the buildings and the area of ground appurtenant thereto; the composition and adjustment of the faculty, the qualifications and powers of the principal, etc. It requires, in addition to the ordinary academical studies, that pupils shall be taught in the theory and practice of teaching, in natural, mental and moral science, language and literature, and that each school shall have attached to it one or more schools for practice, or model schools, with not less than one hundred pupils from the children of the vicinity, and so arranged that the students of the normal school shall there acquire a practical knowledge of the art of teaching, under the instruction of their proper professors. By the 7th section of the act, it is provided as follows:

" That when the trustees of any school desirous of claiming the privilege of this act shall make application to the state superintendent of common schools, it shall be the duty of the superintendent of common schools, together with four other competent and disinterested persons to be chosen by him with the consent of the governor, and all the superintendents of the counties in the normal school district in which such school shall be situate, on receiving due notice from the department of common schools, personally and at the same time to visit and carefully inspect such school; and if after thorough examination thereof and of its by-laws, rules and regulations, and of its general arrangement and facilities for instruction, they or at least two thirds of them shall approve the same and find that they fully come up to the provisions of this act, in that case, and in no other, they shall certify the same to the department of common schools, with their opinions that such school has fully complied with the provisions of this act as far as can be done before going into operation under this act; whereupon the state superintendent shall forthwith recognize such school as a state normal school under this act, and give public notice thereof in two newspapers in each county in the particular normal school district, and thenceforward this act shall go into full operation so far as regards such school without any further proceedings."

The duties assumed and the privileges acquired under this "recognition" are substantially as follows : Each school undertakes to admit one student annually from each of the school districts, within the proper normal school district, at a rate specified, and also to admit practical teachers for a month or more at rates designated ; to be subject to visitation and inspection of the state superintendent, and of the several county superintendents throughout the district, and to make report annually in the month of June, under oath, to the state superintendent, giving a full account of its pecuniary condition, showing income and debts, if any, salaries, and other expenses and dividends declared, together with the number of students admitted and graduated, the branches taught, the apparatus procured, the improvements effected, and the changes made during the preceding year, and such other information as said superintendent of common schools may, from time to time, by his general circular to all of said schools, require to be furnished. The qualification for admission, the course and terms of study, and the bylaws and regulations are all subject to the approval of the state superintendent, who is authorized to take part in all the examinations, to prescribe all the forms and give all instructions required for carrying the system into effect.

After recognition, the school may receive and hold any bequest, gift or endowment not inconsistent with the design of the statute, and the trustees may sue for and recover the same. Graduates of these institutions are entitled to receive from the board of examiners certificates of scholarship and diplomas, which are receivable, throughout the state, as full evidence of practical qualification, and as a permanent license to teach in the common schools.

The act of 1857 has since been amended in several particulars. By the act of April 3, 1872, § 12, it was provided that all examinations of the graduating classes should be conducted by a board, of which the state superintendent or his deputy shall be president, two principals of normal schools, etc., and two county or city superintendents of the district, to be appointed by the state superintendent; and it was afterwards provided (act of April 12, 1875, § 9, P. L. 430), that no certificate or diploma could be issued unless by the affirmative vote of four out of the five members of the board. By the same act of

1875, it is provided that the board of trustees shall consist of eighteen persons, twelve elected by the contributors or stockholders, and six appointed by the superintendent of public instruction, and that the powers and privileges of each class of trustees shall be the same ; that seven shall constitute a quorum, and that it should require a three fourths vote of all the trustees present at any meeting to pass any motion or resolution upon which the yeas and nays were called ; and, further, the changes in the by-laws and rules regulating the proceedings of the board must be approved by the superintendent of public instruction.    The act of March 24, 1877, P. L. 37, repealed the provision for a three fourths vote, " except so far as relates to any motion or resolution for the sale and purchase of real estate, creating liens by judgment or mortgage, for the expenditure of moneys appropriated by the state, or for the surrender of the franchise of the corporation ; and at any such meeting it requires a majority of the whole board of trustees to be present.

It will be observed that by the provisions of this act of 1857 and the amendments thereto, the state normal schools are distinctly private corporations; their management is placed in the hands of trustees elected by the stockholders or contributors. The state simply defined the aim or purpose of the normal schools and laid down the rules by which, in order to obtain the benefits of the act, their affairs should be regulated.    The title to their property, real and personal, is absolutely in the schools ; their management is exclusively in the hands of the trustees, and, subject to the regulations defined by the statute, the affairs of the schools are wholly committed to their care. They were obliged, it is true, to accept certain pupils at certain rates on district account, and in a certain event to give these a preference ; they were subject to visitation by the state superintendent, and the regulations for the government of the school and the course of study are subject to his approval.    But it was competent for the school at any time either to alien the property and to cease operations, or to establish a school for academic or collegiate purposes in which pedagogics and the training of teachers for the common schools might be entirely disregarded, or indeed they might convert the buildings into a hotel or other profitable enterprise, in which the cause of popular

education had no part whatever. Hence the appropriations made by the state have been, in a general way, secured by mortgage or direct lien in order that, in the event of any diversion of the schools from their legitimate and proper aim, the state might be secured in its money. To prevent diversion of the schools to any other purpose, the state resorted to the device of taking mortgages for appropriations made.

By the act of June 13, 1874, P. L. 307, a conditional appropriation of ten thousand dollars was made to the Central Normal School Association, and it was provided : " That in case of the transfer or sale of the buildings or property of said association, either by private sale, legal process or otherwise, whereby the same may be diverted from its intended use for normal school purposes, all moneys which may be appropriated, or have been appropriated, by the state to the said association shall be refunded to the state by the person or persons to whom it may be transferred, by the purchaser or purchasers, and the same is hereby made a lien on said property for said purposes." By the 7th section of the act of April 12, 1875, P. L. 43, it was provided that all state appropriations made directly to the normal schools should be distributed through a commission consisting of the governor, the superintendent of public instruction, and the attorney general, on such conditions as shall protect the interests of the state and do exact and equal justice to the several schools. In the distributions which were subsequently made by the commission, the interests of the state were uniformly protected by mortgage. The special appropriations of May 24, 1889, P. L. 357, and June 16, 1891, P. L. 318, were also by the terms of the several statutes directed to be secured in the same manner.

Thus it will be seen that the state, in all its dealings with the several state normal schools, has treated their property as individual or private property, impressed with no public trust whatever; property that might be aliened, encumbered or otherwise disposed of, so as to be diverted from the purpose of the statute ; and the object and aim of all the legislation since 1857 has been to give the state standing as a creditor against them, in order that, in the event of any such attempted diversion, the state might lay its hand upon the property for its own indemnification.

In view of the provisions of the statute of 1857 and its supplements and of the subsequent dealings of the state with this school, can it be said that it is a public corporation or a quasi public corporation, so that a mechanic's lien cannot be entered against the property essential to its operations? It is plain that it is not public in any strict or technical sense. But private corporations in Pennsylvania have been divided into two classes, corporations which affect the public directly, and are quasi public, and corporations which affect the public indirectly, and are, therefore, strictly private. Upon this ground of distinction it was held in Foster v. Fowler, 60 Pa. 27, that a corporation for introducing water into a town for the public accommodation is a quasi public corporation, and that its buildings, etc., necessary for carrying on its operations are not subject to mechanic's lien. In drawing the distinction between the different classes of corporations apart from those of a purely public nature, Chief Justice Thompson says: "Most people acquainted at all with corporate action understand that corporations, other than municipal which are purely public, naturally divide into public and private corporations; that is, into those that are agencies of the public, directly affecting it; and those which only affect it indirectly by adding to its prosperity in developing its natural resources, or in improving its mental or moral qualities. Of the former are corporations for the building of bridges, turnpike roads, railroads, canals and the like. The public is directly interested in the results to be produced by such corporations in the facilities afforded to travel, and the movements of trade and commerce. It is well settled that this use is not to be disturbed by the seizure of any part of their property essential to their active operations by creditors. . . . This direct benefit to and accommodation of the public very clearly distinguishes this class of corporations from the second class, viz., private corporations, or those in which the public has but indirect interest, such as mining and manufacturing or coal and iron companies, etc., or libraries, literary societies, schools and the like. Whether they progress or cease, the public is not directly affected, and hence liens are enforceable against them, without, as a general thing, regard to the effect upon their operations."

On the other hand, in Girard Point Storage Co. v. South-

wark Foundry Co., 105 Pa. 248, it was held that a company incorporated to transact a general storage and elevator business, including a right to issue warehouse receipts, advance money, etc., is not a public corporation, and its real estate used in the exercise of its franchise is not exempt from mechanic's lien. Pursuing the same line of distinction as in the case of Foster v. Fowler, supra, this court said : " The material question is, what rights have the public in and upon this property other than what it would have did that property belong to a private individual or to an unincorporated partnership? We understand very clearly and distinguish the relation of a turnpike road, canal and railroad to the public ; the people of the commonwealth have a right of way over them, which right, when occasion requires, may be exercised regardless of the will of the corporations owning them. They are highways, and the companies operating them have the right of eminent domain conferred upon them, only because of this direct interest that the public has in these methods of transit. But in the works of the corporation defendant the community at large has no other or further interest than it has in the storehouse of private individuals. It may receive the grain of one person and refuse that of another, or it may at its own will suspend operations, and shut out the public altogether. Its organization is all that it has received from the public. Beyond this the public has no special interest in it, and when this organization disappears, there is nothing left of a public character, or anything over which the commonwealth has control. Very different is the case of a turnpike, a canal or a railroad, which remains for the common use after the corporation which built it is dissolved, and which the state may take possession of for the public welfare." The same distinction between private corporations of a quasi public and of a strictly private nature is recognized in the text-books and in the decisions of the courts of many of the states. In order, however, that a private corporation may be regarded as quasi public, it must exist directly for the public use ; the corporate franchise must be such as is held in the nature of a public trust, and such that the public has standing to assert and enforce its right. Whilst eminent domain is ordinarily an attribute of such a corporation, it is not essential that it shall be given that right. It must be a corporation of a public na-

ture independently of any grant of eminent domain ; private property can only be taken for public use ; the grant of eminent domain for a distinctly private purpose is void ; railroad, canal and turnpike companies, gas and water companies, incorporated directly in the public interests may, therefore, be invested with the power of eminent domain ; whilst an iron works or other manufacturing company, a banking house, an academy or private school ordinarily cannot, for the public has no interest whatever in these except as they may improve the country. Whilst a grant of eminent domain might have some significance, perhaps, upon a question of construction, the absence of such a grant is of no significance whatever in this case, for the exercise of such a right was not essential to the operation of the act. A railroad company is bound to maintain and operate its line ; it cannot alien its franchise, or the property essential to the operation of the road, without express authority. It is bound to carry all persons and goods offered it for transportation, and this public right is capable of enforcement : Thomas v. P. R. Co., 101 U. S. 71 ; Canal Co. v. Bonham, 9 W. & S. 27 ; Union Pac. R. R. Co. v. Hall, 91 U. S. 343 ; R. R. Com'rs v. Railroad Co., 63 Me. 269 ; State v. R. R. Co., 29 Conn. 538 ; N. Y. Cent. etc. Co. v. N. Y. etc. Co., 9 Am. & Eng. R. Cas. 1. "The true criterion, therefore, by which to judge of the character of the use is whether the public may enjoy it by right or only by permission." Mills on Eminent Domain, § 14. If by right, then the property of the corporation may be said to be in the direct use of the public at large, though under the control of private persons or of a corporation. It is not so much a question of what public service the corporation is actually performing, as what public services it must perform.

In Twelfth Street Market Co. v. Philadelphia, etc., R. R. Co., 21 Atl. Rep. 989, it was held that a company authorized to acquire real estate and erect a public market house, to be leased, rented or disposed of on such terms as the managers should determine, is a mere private corporation, bearing no such relation to the state or the public as would exempt its property from the exercise of eminent domain. In the opinion of Judge THAYER—which was adopted by this court—he says : " The test whether a use is public or not is, whether a public

trust is imposed upon the property, or whether the public has a legal right to the use which cannot be gainsaid or denied or withdrawn at the pleasure of the owner. . . . The general public must have a definite and fixed use of the property, a use independent of the will of a private person or corporation in whom the title is vested; a public use which cannot be defeated by the private owner, but which is guarded and controlled by law."

In the act of 1857 there was no promise of state aid; the prestige of their connection with the state, and with the school system, and the power granted them of licensing teachers were expected to bring them into existence and make them successful. The appropriations since made were made to save the system thereby created from utter failure, and the policy of securing these appropriations by lien was felt to be a necessary precaution, growing out of the peculiar provisions of the act, under which these institutions exist as merely private corporations. Under this policy, the state has at last taken firm hold of these institutions; it has accomplished indirectly what it failed at first to do directly. The liens which had been entered have placed the schools wholly within the control of the state, but the rights secured to the state exist, not because of any public function they perform directly in the public interest, under the law, but by virtue of the relation of debtor and creditor which has been established, and by means of which the system is without doubt firmly secured to the aims and objects originally intended. The appointment of six of the eighteen trustees by the state, and the requirement of a three fourths vote upon all motions or resolutions for a sale of the real estate, were intended as a check in the same direction. In a full meeting of the board, this required fourteen affirmative votes, and, assuming that the trustees representing the state would vote in the interest of the state, no such motion or resolution could prevail unless the interests of the state, in their judgment or in the judgment of several of them, would be sustained thereby.

But, apart from the practical control of these schools which the state has thus acquired as a creditor and mortgagee, what public uses or trusts are declared in the act of 1857 or its supplements, or in the private charter of the Central Normal School

which will confer upon it the peculiar privileges or exemptions
of a public corporation ?   It is certainly true that the work of
training teachers, like the work of an academy or a college,
may be conducted with or without a charter of incorporation.
A charter adds nothing to the efficiency of the results attained,
and the certificates of scholarship authorized to be issued, like
diplomas awarded or degrees conferred by colleges, are but
evidence of these results.   The effect of the charter is simply
to combine capital, give perpetual succession and limit respon-
sibility, and this useful device is much resorted to by manufac-
turing and other strictly private commercial companies to attain
these objects.   If the recognition of this normal school were
withdrawn, its operations would not necessarily cease ; it would,
like a corporation upon repeal of its charter, be deprived of
certain privileges, but the work of training teachers might
still be conducted with equal vigor and success.   Nor, with
the exceptions stated, is there any provision in the statute
which gives to the public in general, or to any particular class
of persons, a right to demand admission to these schools.   The
general regulations for the admission of pupils, as in other
schools, are subject to the discretion of the board of trustees.
The right of the corporation to alien its property is conceded
along the whole line of subsequent legislation, and the danger
of a diversion of it, from the proper aim and object provided
by the act of 1857, is distinctly provided against thereby ; not
by placing the property in the control of the corporation upon
the footing of a public trust, but by establishing between the
corporation and the state the direct relation of debtor and
creditor, through which, by judgment, execution and sale, the
rights of the state are to be protected.   This very contingency
has been anticipated by the act of June 4, 1879, P. L. 89, by
which it is provided that in case the real estate of any state
normal school, upon which the state has a lien or liens by
mortgage, shall be exposed to sale by judicial process, it shall
be lawful for the governor, superintendent of public instruc-
tion and attorney general, or a majority of them, if in their
opinion the interests of the state will thereby be promoted, to
cause a bid or bids to be made on behalf of the state at any
such sale, for such sum or sums of money as may in their
judgment be necessary to secure and protect the interests of

the commonwealth; the title, in case the property should be struck down at their bid, to be taken in the name of the commonwealth; and the money is, by that act, appropriated to meet the bids of such officers, upon the amount being returned to and passed by the auditor general.

It is but just to say, however, that although some of the most successful of these schools have been in operation for more than a third of a century, no dividend has ever yet been declared, nor is there even a probability that there ever will be. The most prosperous of them are largely dependent upon the state for aid in making extensions and additions, providing libraries, apparatus, etc. In order that the particular class of persons to be benefited thereby may freely avail themselves of the advantages offered, the rates of charge are necessarily low: and, notwithstanding the large number of pupils in attendance, and the growing popularity of the schools, there has never yet been any surplus for distribution, and it is extremely improbable there ever will be.

It is no doubt true that normal schools, as aids in the work of popular education, have been greatly favored by the people of Pennsylvania. The 17th section of the 3d article of the constitution gives them an express preference in appropriations from the public funds over all other charitable and educational institutions not under the absolute control of the commonwealth. The appropriations which have been made under this section have been such as to render the system, although peculiar in its plan, most effective in its operation; it now ranks most favorably with the normal school systems of other states. The state also contributes fifty cents per week in aid of students who pursue the course of study required with a view to teach in the common schools, and at the time of graduation extends to them a bounty of fifty dollars. Whilst normal schools are no doubt engaged in a most necessary and useful public work, and have been valuable auxiliaries in the education of the masses of the people, the mere fact that they have been incorporated for this particular purpose, and are actually engaged in this work, will not of itself give them the essential qualities of a public corporation. Their charter is in form and effect that of a private corporation merely; their work is but indirectly for the public use, and they must be answerable for their

debts and engagements under the same forms of procedure, and to the same extent, as other private corporations and individuals.

The order of the court of common pleas of Clinton county is reversed, and the mechanic's lien restored, at the costs of the appellee.

PER CURIAM, February 6, 1893:

This opinion was prepared by our late Brother CLARK, and was not filed because we understood the case was under course of settlement. It appears that no settlement was made and the opinion is now filed as the opinion of the court.