Dryden, Appellant, *v.* Pittsburg, Virginia and Charleston Railway Company.

*Railroads—Eminent domain—Exemption of dwelling house—Widening of road—Acts of February* 19, 1849, *P. L.* 79, *and March* 17, 1869, *P. L.* 12.

A railroad company in widening its line may condemn a dwelling house occupied by the owner. The provision of the Act of February 19, 1849, P. L. 79, exempting dwelling houses in the occupancy of their owners is not to be read into the Act of March 17, 1869, P. L. 12, authorizing the widening of railroad lines.

*Statutes—Interpretation—External circumstances.*

As regards the history of external circumstances which lead to the enactment of a statute, the general rule which is applicable to the construction of all other documents is equally applicable to statutes, viz: that the interpreter should so far put himself in the position of those whose words he is interpreting as to be able to see what those words relate to.

Courts will look into the occasion for the passage of a remedial statute and consider the evils it seeks to remedy, their nature and extent, to determine how far it was to reach.

*Railroads—Widening—Act of March* 17, 1869, *P. L.* 12.

The Act of March 17, 1869, P. L. 12, relating to the widening of railroads, is not open to the objection that the extent of the right to take is indefinite because not limited to a specific width. The power to take for purpose of widening is confined to a taking for that purpose alone. Any attempt to appropriate for some other purpose, or in excess of what was necessary for that purpose would not be within the act.

MITCHELL, C. J., dissents.

Argued Nov. 3, 1903. Reargued Jan. 9, 1904. Appeal, No. 130, Oct. T., 1903, by plaintiff, from decree of C. P. No. 3, Allegheny Co., Feb. T., 1903, No. 19, on bill in equity in case of Mary Ann Dryden v. Pittsburg, Virginia & Charleston Railway Company. Before MITCHELL, C. J., DEAN, FELL, BROWN, MESTREZAT, POTTER and THOMPSON, JJ. Affirmed.

Bill in equity for an injunction.

On motion for preliminary injunction, McCLUNG, J., filed the following opinion:

The defendant company was chartered by special Act of April 8, 1867, P. L. 897, under the name of the Monongahela Valley Railroad Company. By Act of February 4, 1870, P. L.

110, the name was changed to Pittsburg, Virginia & Charleston Railway Company.

The charter act provides that the company shall have all the powers and be subject to all the provisions of the general railroad act of 1849.

The defendant company having long since built its line is now widening and improving it to a width of more than sixty feet, and for such purpose proposes to appropriate, under its right of eminent domain, plaintiff's dwelling house now occupied by her, without her consent, and offers her a bond to secure to her her damages.

She files this bill alleging that defendant has no legal right to take the property without her consent.

The railroad act of 1849, P. L. 79, section 10, provides, inter alia, that " the president and directors of such company shall have power and authority . . . . to survey . . . . and determine such route for a railroad as they may deem expedient, not, however, passing through any burying ground or place of public worship or any dwelling house in the occupancy of the owner or owners thereof, without his or their consent, and except in the neighborhood of deep cuttings or high embankments . . . . not to exceed sixty feet in width . . . . and to enter upon and occupy all land on which said railroad may be located."

The act then provides for payment, or securing of compensation and (section 11) for the ascertainment of the amount of damages.

The Act of March 17, 1869, P. L. 12, provides " that it shall and may be lawful for any railroad . . . . company now or hereafter incorporated by or under any law of this commonwealth to straighten, widen, deepen, enlarge and otherwise improve the whole or portions of their lines of railroads . . . . whenever in the opinion of the board of directors of any such company the same may be necessary for the better securing the safety of persons and property, and increasing the facilities and capacity for the transportation of traffic thereon and for such purpose to purchase, hold and use or enter upon, take and appropriate land and materials."

The act then provides for compensation, and (section 2), " Where any such company cannot agree with the owner . . . .

for the compensation proper for the damage done . . . . the same shall be ascertained and paid in the manner provided in the 11th section of the act . . . . February 19, 1849."

Upon May 9, 1871, P. L. 628, a special act was passed conferring upon the defendant company, for the purpose of constructing " its railroad, sidings and appurtenances," the right " to take, hold and acquire the real estate and property reasonably necessary therefor, however the same may be owned, used or occupied."

Upon the interpretation of the three acts of assembly quoted, depends the decision of the case before us.

Counsel for defendant contends that its present proceeding is authorized by the special act of 1871, just quoted. He admits, however, that the language of said act does not, in stating the purposes for which real estate may be taken, include a case of widening. In this view of the case, we cannot see how the act aids the defendant here. It need not be invoked at all, except upon the assumption that, under the acts of 1849 and 1869, the defendant is forbidden to take for widening purposes a dwelling house occupied by the owner under its power of eminent domain.

Assuming this, we cannot see how defendant is aided by an act which simply confers additional power for purposes other than the one now pursued.

We therefore lay aside this act and turn our attention to the other two.

The act of 1849 authorizes the taking of land, etc., for the original construction of a railroad, upon making or securing compensation, i. e., it confers the right of eminent domain, but expressly provides that this shall not extend to a dwelling house in the occupancy of its owner.

The act of 1869 deals with a different subject, i. e., with the improvement and extension of facilities of a road already built, and for this purpose, confers the right of eminent domain, without restriction or exception. It refers to the act of 1849 for the method of ascertaining the damages, but for nothing else.

It authorizes the taking for this purpose " land and materials " not " as in the act of 1849," nor with any exception, but broadly and generally.

There can be no doubt that had the 10th section of the act of 1849 not contained the parenthetical portion, beginning with the words " not however," a homestead could have been taken under the right of eminent domain conferred by the act.

There is nothing equivalent to the parenthesis in the act of 1869.

It matters not whether or not we regard the act of 1869 as a supplement to the act of 1849, nor is there any question of repeal of the provisions of the act of 1849, either expressly or by implication.

The sections of the acts of 1849 and 1869 with which we are dealing might have both been included in one act, without causing any trouble because of conflicting provisions.

If the act of 1849 had provided in one section for the original construction, and for that purpose authorized the taking of property, excepting homesteads, and then in another or even in the same section, authorized widening, etc., and for that purpose authorized the taking of property, excepting nothing, there could be little doubt about the construction.

There is no more doubt where the second provision is by a later act, whether we consider the latter act as an amendment to the former or as an independent act.

We have simply the case of two different subjects dealt with, and in one case restricted, in the other unrestricted, power conferred.

The fact that the act of 1869, which does not distinguish between a house occupied by its owner and one occupied by a tenant, was passed twenty years later than the other, does not weaken, but rather strengthens the inference that a difference was intended.

Possibly if the acts governing this entire subject were now to be passed, the distinction in favor of homesteads would nowhere appear.

The argument based upon the possible abuse of the power does not influence us. Any power granted may be abused. A power such as we are dealing with exists only so far as it is exercised in good faith.

If it is used with even the appearance of arbitrariness, experience and our knowledge of human nature unite in assuring us that the parties taking property will be compelled to

make full compensation with all doubts resolved against them.

This is a case where the plaintiff should be fully secured for her damages beforehand, but we are of opinion that the defendant company has the right to take the property.

We therefore refuse to grant the preliminary injunction prayed for.

*Error assigned* was the decree of the court.

*George N. Monro, Jr.,* with him *George N. Monro,* for appellant.

*John G. Johnson,* with him *Patterson, Sterrett & Acheson,* for appellee.

OPINION BY MR. JUSTICE DEAN, March 7, 1904:

Little need be said in vindication of this decree in addition to what has been so concisely expressed by the learned court below.

Whether the act of 1869 be pronounced a supplement to the act of 1849, or it be an independent act having no necessary connection with the first, the interpretation of it must be the same, that is, it must be given its true intent and meaning in view of the circumstances which prompted its enactment. There is nothing in it which is repugnant to the provisions of the first act, nor are any provisions of the first act neutralized by those of the later one. The later act provides specifically, for the exercise of the power of eminent domain at a time subsequent to the exercise of that power by the company in locating its line; it was passed to accomplish a different purpose, that is, widening a roadbed already located; it is an enabling act intended to reach a situation not contemplated by the first. When we take into view the " old law, the mischief and the remedy " the purpose of the language of both acts becomes clear; the one *is not out of* harmony with the other.

By the act of 1849, " The president and directors of such company shall have power and authority . . . . to survey . . . . and determine such route for a railroad as they may deem expedient; " but broad as is the power, there is, nevertheless, a plain restriction, " not however passing through . . . . any

dwelling house in the occupancy of the owner or owners thereof without his or their consent." Here full power for the original location of the route of the railroad is conferred, fettered, however, by a disabling restriction as to a dwelling house in the actual occupancy of the owner. Nevertheless this restriction, when it comes to the selection of the first route of the railroad, is not necessarily an insuperable obstacle to location; the company is not compelled to locate its roadbed on any particular line; it could in most cases, and especially in that early day, avoid a dwelling house by adopting a more costly line which did not touch it. It may be doubted whether if the exigencies and necessities of the future had then been foreseen as they are now known, the legislature would, fifty years ago, have imposed even such a restriction.

A restriction of this kind does hamper, and does in many cases obstruct great public improvements: improvements not projected and constructed for the benefit alone of the corporation, or of any particular locality, but for the advantage of the whole commonwealth. And when damage is done an individual for the benefit of the public, full compensation is provided for. But whether a restriction imposed more than half a century ago be at this day reasonable or unreasonable, is not the question before us; it is the law of the land and must, in the location and adoption of a route be observed. For twenty years there was no relaxation or modification of this restriction. During that period railroads were empowered to appropriate a width of not exceeding sixty feet for their roadbed; some took more and some less; it has however been held that a clearly defined exercise of the power of appropriation exhausted the power. Whether the taking had been of a strip as wide as authorized or narrower, in a very few years railroad companies discovered that the mere opening and operation of their lines so stimulated and increased business, traffic and travel, that population pressed them on each side of their lines; many kinds of business got as close to the roadbed as possible; even the noise and discomfort to occupants of dwelling houses was not sufficient to deter them in many cases from building and living close to the railroad. In the meantime the business of the railroads had enormously expanded; they wanted more room; in many cases it was impossible for them to perform the duties

enjoined upon them by law and which by their charters they
were bound to perform without increase of trackage ; the
public suffered as well as they ; they had exhausted their power
of location by their original taking ; the land on each side had
been improved by the erection of dwelling houses and other
improvements close up to their roadbed ; they could not move
their main line, and if they could have done so, they would
have been met by practically the same obstacles on a new
route.   Yet the public demands for transportation facilities had
to be met.   Such were the facts which in 1869 prompted the
passage of that act.   It was a necessity, which necessity has
since become far more imperative.

The act of 1869 reads as follows : " That it shall and may
be lawful for any railroad companies now or hereafter in-
corporated, . . . . to widen, deepen, enlarge or otherwise improve
the whole or portions of their line of railroad . . . . whenever in
the opinion of the board of directors of any such company the
same may be necessary for the better securing the safety of
persons and property, and increasing the facilities and capacity
for the transportation of traffic thereon, and for such purpose
to purchase, hold and use or enter upon, take and appropriate
land and materials."

By its express terms this act conferred upon railroad com-
panies an authority which they did not theretofore have ; it
restricted no road, whether its original taking was sixty feet, or
less, to its first appropriation ; it could widen and otherwise
improve its line whenever in the opinion of its board of direct-
ors such widening was necessary.   To give the act any other
meaning, would in view of the facts defeat its main purpose.
Any house owner could effectually put a stop to any attempt
of the company to provide for the safety of persons and prop-
erty or to furnish increased facilities for transportation.   There
is not a word in the act which manifests an intention to limit
the power as in the tenth section of the act of 1849, nor has it
ever been so interpreted by this court.

And this is the rule of interpretation to be adopted under
such circumstances.   Judge ENDLICH in his valuable work on
the Interpretation of Statutes, sec. 28, says : " As regards the
history or external circumstances which led to the enactment
(of the statute), the general rule which is applicable to the

construction of all other documents is equally applicable to statutes, viz : that the interpreter should so far put himself in the position of those whose words he is interpreting as to be able to see what those words relate to." We must place ourselves in the situation of the legislature of 1869 ; at that time with the necessity before them which the experience of twenty years had demonstrated, with the palpable fact that such a restriction as that in the act of 1849 would defeat the very purpose they had in view, they passed the act of 1869, which has in it not a word indicating an intent to exclude a dwelling house in the taking of land for widening. Yet in the year preceding, in the act of 1868, they had carefully preserved the restrictions as to taking for an original location by saying, " Subject to all the restrictions and liabilities of the act " of 1849.

Treat the act of 1869 as a supplement to that of 1849, it does not follow that we must import into the later statute the dwelling house restriction of the first act. Taking into view the twenty years' interval between the two statutes, the suggestive facts made obvious by experience, the significant absence of any words pointing to restriction, it seems clear that the intention is to confer a power to widen without restriction. " Courts will look into the occasion for the passage of such a statute (a remedial one) and consider the evils it seeks to remedy, their nature and extent to determine how far it was to reach: " 1 Kent, 455 : Stewart v. Kahn, 11 Wall. 493 ; Gyger's Estate, 65 Pa. 311.

And this is the purport of our decision in Bigler v. Penna. Canal Co., 177 Pa. 28.

The argument that the extent of the right to take is indefinite because not limited to a specific width cannot be sustained. The power to take for purpose of widening is confined to a taking for that purpose alone. Any attempt to appropriate for some other purpose or in excess of what was necessary for that purpose would not be within the act; in this particular it is as definite as the act of 1849, which limits the width to sixty feet except in the neighborhood of deep cuttings or high embankments. It follows that in such cases the width is only limited by as much more as is necessary for proper construction.

We think the interpretation put upon the act by the court

below is correct and the decree is affirmed at costs of appellant.

MR. CHIEF JUSTICE MITCHELL dissenting:

I am of opinion that the acts of 1849 and 1869 should be read together and that, so read, the restrictions on the right of eminent domain under the act of 1849 are equally in force against the right under the act of 1869.

I would reverse this decree and award an injunction.