## Commonwealth, ex rel., v. Keystone Pipe Line Co.

404

*William A. Schnader,* Attorney General, *Powell & Ludlow, J. Willison Smith, Jr.,* and *Nauman, Smith & Hurlock,* for Commonwealth.

*Snyder, Miller, Hull & Hull, Oscar H. Price, Frank M. Hunter, John H. Stone* and *Harry Rosenblum,* for defendant.

HARGEST, P. J., April 5, 1934.—The Commonwealth has filed a suggestion in quo warranto calling upon the defendant company to show by what authority it has exercised the right of eminent domain in the construction of a pipe line for the purpose of transporting petroleum and refined petroleum products. An answer was filed averring statutory authority.

*Findings of fact*

1. J. W. Van Dyke, W. M. Irish and R. C. Tuttle presented to the Secretary of the Commonwealth on or about April 7, 1931, articles of association for the purpose of procuring the charter of the defendant company under the General Corporation Law of April 29, 1874, P. L. 73, and its supplements.

2. The said corporation, as expressed in the articles of association, was formed, inter alia, "for the purpose of transporting, storing, insuring and shipping petroleum and refined petroleum products, and to construct, maintain and operate such pipe lines, tanks and facilities as are necessary and proper for the conduct of said business, said pipe line or pipe lines to run within the Commonwealth of Pennsylvania" along the routes in said applica-

tion defined "and by such route or routes as may now or hereafter be approved by the Public Service Commission of the Commonwealth of Pennsylvania, or any body succeeding to its power and/or jurisdiction".

3. The principal place of business of said corporation is in the City of Philadelphia. The amount of capital stock was fixed in the charter application at $100,000, divided into 1,000 shares of a par value of $100 each.

4. At the time approval by the Public Service Commission was requested the incorporators represented that the capital stock would be forthwith increased to approximately $2,500,000 and on or about June 16, 1931, the capital stock of the company was, by proper corporate action, so increased, and $1,750,000 thereof was issued, of which $1,740,000 was subscribed by the Atlantic Company, a wholly owned subsidiary of the Atlantic Refining Company and of the remaining 100 shares J. W. Van Dyke, who is chairman of the board of the Atlantic Refining Company, owns 50 shares, W. M. Irish, president of the Atlantic Refining Company, 25 shares, and R. C. Tuttle, general manager of transportation of the Atlantic Refining Company, 25 shares.

5. Concurrently with the application for charter, two applications were filed with the Public Service Commission, one for approval of the incorporation and the other for the approval of the beginning of the exercise of the rights, powers, franchises and privileges under said incorporation. In each of these applications the incorporators aver: "The proposed corporation is organized for the purpose of transporting, storing, insuring and shipping petroleum and refined petroleum products, and to construct, maintain and operate such pipe lines, tanks and facilities as are necessary and proper for the conduct of said business and more particularly set forth in the statement of corporate purpose as contained in its articles of incorporation on file with the Secretary of the Commonwealth and duly certified to your commission".

6. The applications to the Public Service Commission

each set out in paragraph 8 the method of construction of the pipe line and other equipment and that they would be constructed "in accordance with the best engineering practice, and with every possible safeguard against fire and other hazards" and, in paragraph 11, an allegation that the "proposed public service company is necessary for service, accommodation and convenience of the public" for the reason that the "oil industry generally is handicapped by not having sufficient quick, efficient and economic means of transporting petroleum and refined petroleum products for distribution to dealers and customers" and that this line and additional lines will be constructed "so that it will be possible for the oil and petroleum industry to transport and ship quickly and economically by pipe lines, petroleum and refined petroleum products from or to refineries and important distributing points for said products throughout the State".

7. After due public notice the Public Service Commission fixed and held a hearing at which it was represented on behalf of the incorporators that the company was proposed "and intended to be incorporated as a common carrier, under clause 18 of the second division of section 1 of the Corporation Act of 1874, as expanded by the supplementary and amendatory Act of June 2, 1883, P. L. 61, and the Act of April 30, 1929, P. L. 896".

8. On or about May 11, 1931, the Public Service Commission issued its certificate of public convenience approving the incorporation of the defendant company "for the purpose of transporting, storing, insuring and shipping petroleum and refined petroleum products", which certificate avers "a full investigation of the matters and things involved having been had, the commission finds and determines that the granting of said petition is necessary and proper for the service, accommodation, convenience and safety of the public". The commission also declared that "full investigation of the matters and things involved having been had . . . the commission finds and deter-

mines that the approval of the beginning of the exercise by the Keystone Pipe Line Company of the rights and privileges of transporting, storing and shipping petroleum and refined petroleum products . . . is necessary and proper for the service, accommodation and convenience of the public".

9. The Secretary of the Commonwealth having found that the proposed articles of association were in conformity with law and having certified them to the Public Service Commission, after the action of the Public Service Commission, the Governor, on May 19, 1931, issued letters patent incorporating the defendant company and the articles of association and letters patent were duly received in the recorder's office in the County of Philadelphia.

10. On or about July 7, 1931, the defendant began the construction of its system of pipe line at a point 0.13 mile from the plant of the Atlantic Refining Company located at Point Breeze, Philadelphia, thence through Delaware County and Chester County to Montello, Berks County, and from there two branches, one extending northwardly through Berks, Schuylkill and Luzerne Counties to a point near Kingston in Luzerne County and the other through Berks, Lancaster, Lebanon, Dauphin and Cumberland Counties to Mechanicsburg in Cumberland County. From the first mentioned branch another branch extends from a point in Tilden Township, Berks County, to Fullerton in Lehigh County. Said lines are 226 miles long, constructed at a cost of approximately $2,100,000, of which $1,750,000 consisted of cash, realized from the sale of stock and about $350,000 from receipts from earnings after operations were begun.

11. The whole of defendant's system except a small portion of the north branch was completed prior to December 5, 1931, when Ben T. Welsh first suggested that he might petition the Attorney General to institute quo warranto proceedings and the sums of money referred to in finding no. 10 were invested prior to February 17, 1932, when

he filed such petition with the Attorney General from which the present proceeding resulted.

12. The defendant's pipe line system was constructed along or across approximately 830 parcels of land. From seventy-five to one hundred of such parcels were within the boundaries of public highways. Right of way easements were acquired by purchase over approximately six hundred parcels of land privately owned and by condemnation or the exercise of eminent domain over approximately 140. In each case of condemnation the defendant gave its bond which was accepted by the property owner or presented to and approved by a judge of the court of common pleas in the county in which the land lay. Three property owners objected to the proceedings; two have withdrawn their objections, and Ben T. Welsh is now the only objecting property owner.

13. Between July 1 and December 31, 1931, the Department of Highways of the Commonwealth issued to the defendant permits for the location, construction and maintenance of its pipe line, for which permits the defendant paid, as fees and for inspection, the sum of $2,643.80. Under such permits the defendant's lines cross the public highways at 293 places and are maintained for more than fifteen miles below such highways.

14. The Water and Power Resources Board of the Commonwealth, between August 15 and December 31, 1931, issued to the defendant permits for locating, constructing and operating its pipe line through, under and across numerous rivers and other public waters of the Commonwealth. Under such permits the defendant has crossed such waters at 107 places and is maintaining and operating approximately two miles of its line beneath said waters.

15. Prior to January 16, 1933, when this proceeding was begun, no officer, department, board, commission or agency of the Commonwealth and no officer or representative of any county, borough, township or other municipality made any protest or objection to the location

and construction of the lines and facilities of the defendant.

16. The facilities of the defendant company consist of an intake and pumping station at Point Breeze, Philadelphia, located on one acre of land leased from the Atlantic Refining Company for a period of 20 years at an annual rental of $1800; an 8-inch line from Point Breeze to Montello; a 6-inch line from Montello to a point near Kingston; a 6-inch line from Montello to Mechanicsburg; a 4-inch line from Tilden Township in Berks County to Fullerton; a pumping station at Logue in Berks County located on land owned in fee by the defendant company. The present points of delivery are at Exton, Montello, Pinedale, Barnesdale, Beach Haven, Kingston, Quentin, Mechanicsburg and Fullerton, all in Pennsylvania.

17. The first unit of defendant's system from Philadelphia to Montello and from Montello to Mechanicsburg was completed and put into action November 28, 1931. From that date to September 10, 1933, it transported through its pipe lines 238,000,000 gallons of gasoline. On February 20, 1933, it began to transport kerosene and furnace oil and from that date to September 10, 1933, it transported through said lines 3,380,183 gallons of kerosene and 850,504 gallons of furnace oil.

18. For the period from November 28, 1931, to June 30, 1933, the defendant filed semiannual reports of its gross receipts, pursuant to the provisions of the Act of June 1, 1889, P. L. 420, and paid gross receipts taxes amounting to $8,689.36.

19. The defendant has filed with the Public Service Commission tariffs issued November 28, 1931, January 12, 1932, September 30, 1932, December 1, 1932, February 9, 1933, and September 1, 1933, each effective shortly after it was issued. These tariffs provided for local rates for the transportation of petroleum, petroleum oils and gasoline from Point Breeze Station to the stations mentioned in finding no. 16 and proportional rates for trans-

portation beyond said stations either by railroad or truck to destinations in New York, Maryland, Virginia, West Virginia and Ohio. The said tariffs contained rules and regulations governing the service which the company was ready, able and willing to perform. The tariffs were prepared by Robert C. Tuttle, who is vice-president and general manager of the defendant company and also general manager of transportation of the Atlantic Refining Company, in conjunction with the chemical engineer of the Atlantic Refining Company.

20. The defendant has held itself out as a public service company ready to transport petroleum and refined petroleum products by filing tariffs with the Public Service Commission of Pennsylvania and is willing to transport the commodities covered by its tariffs subject to the rules and regulations contained in them and the rules and regulations of the Public Service Commission. The defendant has not in any other way than by filing its tariffs held itself out as ready to transport petroleum products and at present has no customer other than the Atlantic Refining Company. The rates, rules and regulations contained in the tariffs filed with the Public Service Commission do not limit the use of defendant's system to one customer but provide for transportation without discrimination for all shippers upon the same terms and conditions.

21. The defendant's pipe line system and facilities were not constructed for the sole purpose of transporting gasoline but are designed and constructed so as to be used for the transportation of all kinds of petroleum products and the defendant has transported the ordinary "White Flash" gasoline, ethylized gasoline, kerosene and furnace oil in its pipe line and one commodity following the other without any water plug between them and without contamination of the several commodities.

22. There are 13 oil companies within the immediate vicinity of the defendant's intake pipe line at Point Breeze ranging from less than one mile distant up to approxi-

mately five miles, which maintain refineries, tank farms, storage tanks, or similar facilities, with which connections could be made from defendant's lines. All these companies are engaged in the distribution of petroleum and petroleum products, including gasoline, kerosene and furnace oil, and all of them but one had their plants located in the vicinity before 1929.

23. Of the 13 companies in the immediate vicinity of the intake pipe line of the defendant company, three of them are connected with pipe lines as follows: The Sun Oil Company with the Susquehanna Pipe Line Company, at or near Chester; the Pure Oil Company with the United States Pipe Line at Marcus Hook; the Standard Oil Company with the National Transit Company at Marcus Hook. The Susquehanna Pipe Line is the only one which transverses any of the territory served by the defendant and the National Transit Line is not at present used for the transportation of gasoline.

24. Within five miles of the line of the defendant there are numerous wharves and docks to which oil companies which do not have facilities near Point Breeze might bring oil by tank ships to be delivered to the defendant for transportation.

25. It is physically possible and economically practicable to connect the pipe line of the defendant with all of the plants of the 13 oil companies now located in the Point Breeze area and also with numerous wharves and docks in that vicinity and for the defendant by means of such connection to receive from, and transport oil for, all of said 13 companies and for others which may bring oil to the wharves and docks. No potential customer had any physical connection at the time of hearing with the defendant's pipe line system.

26. The defendant's pipe line crosses the pipe lines of the Susquehanna Pipe Line Company, the United States Pipe Line Company and the Tuscarora Oil Company, Ltd. It is physically possible and economically feasible for the defendant to make connections therewith and to trans-

port petroleum products through the joint use of these facilities.

27. The greatest distance to which gasoline may be economically transported by motor truck is 60 miles. The loss in transporting gasoline by pipe line is substantially less than by railroad or motor truck and the defendant's basis for the cost of transportation is substantially less than the railroad rates.

28. The present 24-hour capacity of the defendant's line is 12,500 barrels of 50 gallons each and the average amount which it has transported for the Atlantic Refining Company is 8,200 barrels per day. By the installation of additional pumps which could be completed in about thirty days the capacity could be increased to 40,000 barrels, but it might be more economical to increase the capacity by the construction of a second pipe line.

29. Shortly before February 17, 1932, when Ben T. Welsh filed his petition with the Attorney General for the institution of this proceeding, the Pure Oil Company, Gulf Refining Company and Standard Oil Company had made inquiries of the defendant company with respect to the transportation of oil by the defendant through its pipe line for said companies. The filing of said petition stopped the negotiations.

30. The Susquehanna Pipe Line Company was incorporated March 28, 1930, for the purpose of transporting "petroleum and refined petroleum products" through pipe lines and after the approval of, and certificate of convenience issued by, the Public Service Commission it constructed a system of pipe line within this Commonwealth. It began the transportation of gasoline through said line January 15, 1931, and has continued such transportation since that time.

31. Prior to the incorporation of the defendant company on May 19, 1931, the Susquehanna Pipe Line Company had invested more than five million dollars in the construction of its line within the State of Pennsylvania,

which is 546.6 miles long, and in such construction frequently asserted and exercised the right of eminent domain without any objection on the part of the Commonwealth or any of its officers, departments or commissions.

32. The incorporators of the defendant and its officers subsequent to incorporation, knew of the prior incorporation of the Susquehanna Pipe Line Company; of its charter purposes; that it had received the approval of the Public Service Commission; that it had condemned rights of way; that it had exercised the right of eminent domain without objection by the Commonwealth and constructed its line at the cost of more than five million dollars; that it was engaged in the transportation of gasoline by pipe line without objection or protest on the part of the Commonwealth. Acting upon such knowledge the defendant company constructed its lines at a cost of more than two million dollars. If the Commonwealth had challenged the right of the Susquehanna Company the defendant would not have made that investment or construction.

33. The present United States Pipe Line Company operates a pipe line through Delaware, Chester, Montgomery, Bucks and Northampton Counties, and the Tuscarora Oil Company, Ltd., operates a pipe line from New Jersey across the State of Pennsylvania to the Ohio line. These companies are engaged in the transportation of gasoline and refined petroleum products by pipe line through the State and were so engaged when the defendant was incorporated.

34. Prior to 1929 the Tuscarora Oil Company, Ltd., was engaged in the transportation of gasoline by pipe line from New Jersey to points in Pennsylvania and beyond.

35. In 1883, and prior thereto, approximately 30 oil refineries were located in Pennsylvania counties in which oil was produced and were owned and operated independently of the Standard Oil Company and in active competition with it. These refineries produced several grades of kerosene, commercially known as Standard White, Water White and Prime White, and also naphtha,

gasoline and lubricating oils in sufficiently large quantities to justify transportation by pipe line. They had no means of transporting their refined products to markets in Philadelphia and New York except by railroad and the Standard Oil Company enjoyed more favorable freight rates from the railroads than the independent competitors.

36. The cost of transportation of refined petroleum by railroad was twice as great as the cost by pipe line. The Standard Oil Company shipped its crude oil through pipe lines of the National Transit Company, which it controlled, to Marcus Hook, Philadelphia and coast refineries. Until June 1928 no pipe line company carried crude oil across the State from east to west. At that time the National Transit Company transported crude oil from Philadelphia to the Ohio State line.

37. The former United States Pipe Line Company was organized under the Act of June 2, 1883, P. L. 61, by the independent refineries and oil producers in the counties of western Pennsylvania for the purpose of transporting their refined oils to the seaboard in competition with the Standard Oil Company. Prior to 1892 these refiners had no means of transportation of their kerosene to market other than by railroad. The pipe line company constructed its lines from Oil City to Freemansburg, Pa., in 1892, and extended them in 1901 to Marcus Hook and from 1892 to 1912 one of these lines was used for kerosene and the other for crude oil. From 1912 to 1922 both were used for kerosene. In 1922 the company went out of existence.

38. The gasoline content of kerosene or coal oil as that commodity was commercially sold in 1883 ranged from 40 to 95 percent. The gasoline content of kerosene or coal oil which is commercially sold today ranges from 25 to 68 percent. The gasoline content of crude petroleum as it comes from the wells in Pennsylvania ranges from 39.5 to 53 percent. The gasoline content of Light Refugio crude oil from Refugio County, Tex., is 94 percent and of Kettleman Hills crude oil of Kings County, Calif., is 85 percent.

39. In 1895 the National Transit Company, through its pipe line, transported and delivered to the Atlantic Refining Company at Point Breeze 4,391,061 gallons of naphtha, and 5,832,356 gallons of celsius distillate, which is the kerosene distillate from crude oil before it is treated with sulphuric acid.

40. Liquid gasoline itself is not explosive. The gas generated from gasoline is explosive only when the proportions of such gas in the air range from $1\frac{1}{2}$ to 6 percent. The hazards involved in the transportation of gasoline and crude oil by pipe line are different in character but there is no proof that where there is proper construction the hazards in one case are appreciably greater than in the other.

41. The term "petroleum" embraces crude petroleum as it is found in the ground and "refined petroleum" is that which has been submitted to some process of refinement. Oil, in the generic sense, must be some material which is, first, a liquid; second, is not soluble in water; third, is chemically combustible, and fourth, is soluble in ether.

42. Gasoline is a refined product of petroleum, a petroleum naphtha which is suitable for use as a carburetant in an internal combustion motor such as that in an automobile.

43. Gasoline is oil.

44. Gasoline is a commodity in general use by a very large proportion of the inhabitants of Pennsylvania and its transportation, sale and distribution substantially affect the business interests, convenience and welfare of the public within this Commonwealth.

45. It is in the interest of the public within this Commonwealth to have gasoline transported from the sources of supply and distributed to the consuming public as speedily and as economically as may be done.

46. Under present conditions a pipe line system is the most expeditious means of transportation of either crude or refined oil and it is in the interest of the public within

the Commonwealth of Pennsylvania that pipe line companies acquire their rights of way at fair market values and construct their systems at reasonable cost so that the rates of transportation to the public may be fair and reasonable.

47. The directors of the Keystone Pipe Line Company are J. W. Van Dyke, president, who is also chairman of the board of the Atlantic Refining Company; W. M. Irish, vice-president, who is president of the Atlantic Refining Company; R. C. Tuttle, vice-president and general manager, who is general manager of transportation of the Atlantic Refining Company; R. H. Colley, treasurer; B. J. McKain, secretary; Paul Shuman, assistant treasurer; N. S. McCausland, assistant treasurer. These seven officers receive no salaries from the Keystone Pipe Line Company, but receive salaries for services to the Atlantic Refining Company.

48. The Keystone Pipe Line Company rents office space in the Atlantic Building, owned and operated by the Atlantic Refining Company, in Philadelphia, and pays rent therefor at the rate of $127.92 per month, which is the average amount paid by other tenants for the same space.

The tanks and storage facilities to which the defendant delivers the product of the Atlantic Refining Company are owned by the latter company and the product is received by employes of the Atlantic Refining Company. The pumping operations are in charge of the defendant's engineers and employes.

49. The Keystone Pipe Line Company did not appear, prior to the date when this cause came for trial, in the current telephone book in Philadelphia, but its office at Logue, Pa., appears in the directory of Morgantown, Berks County, under the name of the defendant company. . . .

### Discussion

This case, owing to its importance, has been presented with commendable detail, and with great ability on both sides.

In approaching the consideration of the various questions we recognize the well-settled rule that quo warranto is a high prerogative writ belonging to the sovereign and in such cases the burden of establishing a right, when challenged by the sovereign, is upon the defendant: Commonwealth, ex rel., v. Heller et al., 31 Pa. C. C. 267; Commonwealth, ex rel., v. Hargest, 7 Pa. C. C. 333; 22 R. C. L. 716; 17 Enc. Pl. & Pr. 481; 51 C. J. 352, sec. 75. We also recognize that, as a general principle, statutes delegating the power of eminent domain must be strictly construed, the right must be clearly and not merely inferentially conferred and every doubt must be resolved against the corporation claiming it: Bly v. White Deer Mountain Water Co., 197 Pa. 80, 92, 96, 98; Crescent Pipe Line Company's Petition, 56 Pa. Superior Ct. 201, 206; Solar Electric Company's Appeal (No. 1), 290 Pa. 156, 160, 164.

But this second principle does not mean that in deciding a particular question the rules of construction should be reversed. To illustrate: Involved in this case is the question of repeal of statutes by implication. Because a strict construction is put upon the right of the power of eminent domain we are not required to reverse the rule that repeals by implication are not favored; nor to reverse the rule that every presumption must be indulged in, in favor of the constitutionality of a statute. The rule as to the strict interpretation of the right of eminent domain means that, if the language under which the right is claimed does not clearly bestow it, it does not exist. The rule of strict construction as to the charter right and the right of eminent domain in this case means that if after we have considered each phase of this case under the principles that are applicable to the determination of that particular phase, there is, under the whole case, a doubt as to the right claimed by the defendant, that doubt must be decided against the defendant.

With these principles in mind we approach the questions raised, namely: (1) Whether the Act of June 2, 1883, P. L. 61, under which the defendant claims the

right to exercise eminent domain has been repealed by implication, and whether the Acts of June 2, 1883, P. L. 61, and April 30, 1929, P. L. 896, are valid and constitutional; (2) whether the terms "oil" and "petroleum" as used in these acts include refined petroleum and gasoline; (3) whether the defendant company is a quasi-public corporation with the right to exercise eminent domain; (4) whether the Commonwealth is estopped by laches from securing a forfeiture of any rights acquired by the defendant in the exercise of the right of eminent domain.

1. Has the Act of June 2, 1883, P. L. 61, been repealed, and is the Act of April 30, 1929, P. L. 896 a valid statute? This Act of 1883, as its title indicates, is a supplement to the General Corporation Law of April 29, 1874, P. L. 73. It amends clause 18 by "authorizing the incorporation of pipe lines for the transportation of petroleum, and providing for the exercise of the right of eminent domain in taking lands and property for such purposes." The body of the act provides:

"Companies may be organized under this act, having the right to transport, store, insure and ship petroleum, and for that purpose to lay down, construct and maintain pipes, tubing tanks, offices and such other machinery, devices or arrangements as may be necessary to fully carry out that right; and also with the right to enter upon, take and occupy such land and other property, as may be requisite for the purposes of such corporations."

At the same session of the Legislature of 1883 "a further supplement" to the Corporation Act of 1874 was approved on June 22, P. L. 156, which also amended clause 18 by providing for the incorporation of companies for the purpose of driving and floating saw logs, lumber and timber. This act did not recite clause 18 as it was amended by the Act of June 2nd, but recited it as it theretofore stood, without including the provision for the incorporation of pipe lines. The Commonwealth concedes that this act, having been passed at the same ses-

sion of the legislature, did not repeal the first supplement. The Act of May 21, 1889, P. L. 259, is a further supplement. It recited clause 18 as it had been amended by the Act of June 22, 1883, supra, to be "amended and extended" by providing for the incorporation of water companies and enlarging the powers of corporations for driving and floating saw logs, lumber and timber. It is now contended that the Act of 1889, having cited the second Act of 1883 for amendment and leaving out the power to incorporate pipe line companies with the right of eminent domain provided by the first Act of 1883, repealed the first act. We have before us, however, the anomalous situation that while private counsel for the Commonwealth are pressing this contention the Attorney General, in his opinion allowing the petition of Ben T. Welch for the institution of these quo warranto proceedings, very definitely concluded that the first Act of 1883 was not repealed: Welch's Petition, 18 D. & C. 23, 26, 27. We think there is no question concerning the soundness of the Attorney General's conclusion. In the first place, each of these three acts is a supplement and each of them did what the legislature intended to do, namely, provide for the incorporation of an additional class of corporations: by the first Act of 1883, pipe line companies; by the second, companies for the purpose of driving and floating logs and lumber, and by the Act of 1889, power companies. When the legislature provides for additional classes of corporations by separate supplemental acts there can be no legislative intention to abolish one of those classes merely by the misrecital of one of those supplements. Such a conclusion would reverse the rule that repeals by implication are not favored. But this proposition has been so thoroughly settled that extended discussion of it would effect no useful purpose. In Wagner v. Wagner, 24 Dauph. 147, we said: "It is not true as a general proposition that the amendment of a prior statute repeals an intervening one. The intention to effect such repeal must be manifest."

In 59 C. J. 926, it is said:

"In so far as a later law is merely a reënactment of an earlier one, it will not repeal an intermediate act which qualifies or limits the first one, but such intermediate act will be deemed to remain in force, and to qualify or modify the new act in the same manner as it did the first."

In Commonwealth v. Provident Trust Co., 29 Dauph. 81, 84, after referring to the principle that repeals by implication are not favored, we said, quoting from Commonwealth, ex rel., v. De Camp, 177 Pa. 112, 116:

"It is not enough that there is a discrepancy between different parts of a system of legislation on the same general subject; there must be a conflict between different acts on the same specific subject."

As said in Mercersburg College v. Mercersburg Borough, 53 Pa. Superior Ct. 388, 399, the Act of March 24, 1909, P. L. 54, relates to a subject different from that covered by the amendment of May 29, 1901, P. L. 319, and is not repugnant to the latter. So in the instant case each of the two Acts of 1883 and the Act of 1889 relate to different subjects in that they make provision for the incorporation of additional kinds of corporations. The cases of Commonwealth, ex rel., v. Taylor et al., 159 Pa. 451, and Provident Life & Trust Co. v. Klemmer et al., 257 Pa. 91, definitely dispose of this question and sustain the statement of it as found in 59 C. J. 926:

"In so far as a later law is merely a reënactment of an earlier one, it will not repeal an intermediate act which qualifies or limits the first one, but such intermediate act will be deemed to remain in force, and to qualify or modify the new act in the same manner as it did the first."

There is no doubt that by browsing around through the great mass of cases dealing with repeals by implication language may be culled which appears to support the Commonwealth's contention, but we think the application of the settled principle we have announced de-

termines that section 1 of the Act of June 2, 1883, is not repealed by the Act of 1889.

In Lehigh Valley Coal Co. v. United States Pipe Line Co., 3 Dist. R. 70, it was held that the right of a pipe line company to exercise the power of eminent domain for the transportation of petroleum did not depend upon section 1 of the Act of June 2, 1883, P. L. 61, which reënacts clause 18 of the Act of 1874, and even if it might be held that the first section of the Act of June 2, 1883 was repealed, sections 2 and 3 would be sufficient to sustain the claim of the defendant. An act clearly unconstitutional will be so held even though standing for years on the statute books: Kucker v. Sunlight Oil & Gasoline Co., 230 Pa. 528, 533; Collins v. Kephart et al., 271 Pa. 428, 434. But there is no serious question of unconstitutionality raised against this act. Only a questionable repeal by implication is asserted. The Act of 1889 has been on the statute books for more than forty years and during that period the right of eminent domain under the Act of June 2, 1883, P. L. 61, has not been challenged. Pipe line companies have been incorporated under its provisions and great amounts of money have been invested. In this situation we think the principle announced in Commonwealth v. Gilligan, 195 Pa. 504, 511, applies:

"The act has stood on the statute book, without challenge for nearly a quarter of a century, and millions of dollars of school funds have been collected and disbursed under its provisions. While these are not reasons for refusing to declare it void if in contravention of the constitution, yet they are strongly persuasive that the act is not so clearly unconstitutional as it should be shown to be to make it our duty now to set it aside: In re Sugar Notch Borough, 192 Pa. 349, 358."

If the Act of 1889 did not repeal the Act of June 2, 1883, then the Act of April 30, 1929, P. L. 896, purporting to amend the Act of June 2, 1883, had a subsisting statute on which to hang an amendment and it follows that the Act of 1929 is valid. The question of the constitu-

tionality of the Acts of 1883 and 1929 has been hinted at rather than argued. Courts do not declare acts unconstitutional until they are clearly shown to be so. We find nothing as to these acts to require such a finding.

For these reasons we are bound to conclude that the Act of June 2, 1883, has not been repealed, that the Act of 1929 is valid and that neither act is unconstitutional.

2. Do the terms "oil" and "petroleum" as used in the Act of June 2, 1883, P. L. 61, and its supplements include refined petroleum and gasoline?

This discussion involves findings of fact nos. 38 to 43, inclusive. The Act of 1883 provides for the incorporation of pipe line companies "for the transportation of petroleum". Section 2 of the act recites "That all companies incorporated or hereafter to be incorporated under the provisions of the act to which this is a supplement, for the purpose of the transportation and storage of oil, by means of pipe lines and tanks, for the public, shall have the power" therein designated. The word "oil" is elsewhere used in the act. Section 2, authorizing the laying of pipe lines "[from any point or points in any of the counties in which petroleum is produced to any railroad, canal, navigable river, port or city within this Commonwealth,] and for all necessary purposes of the corporation," is amended by the Act of April 30, 1929, P. L. 896, by cutting out the language in the brackets and providing: "necessary and incident to the carrying on of its said business of transporting and storing oil for the public through and within this Commonwealth". In both acts the words "petroleum" and "oil" are used. It therefore appears that the legislature used those two words synonymously. The charter of the defendant company purports to confer the right to transport "petroleum and refined petroleum products." The defendant transports gasoline. Gasoline is a refined petroleum product. It has the right of eminent domain under the statutes to transport oil or petroleum, and the Act of 1929 takes away any limitation on the direction in which the oil goes or the

place where the transportation originates. It is therefore essentially important to determine whether gasoline is either petroleum or oil. Strange as it may seem, there is no recognized standard definition of what constitutes an oil, generically speaking, either in the domain of chemistry or among the lexicographers. Experts of great renown were called in this case. It was shown that, in the process of distillation of crude petroleum, gasoline was one of the first products followed by kerosene and the lubricating oils of various density or viscosity. It was also shown that there are three principal kinds of oil: mineral, vegetable and animal. It is contended on the one side or the other that various tests must be applied to determine whether a substance is an oil.

(a) Chemists for the plaintiff testified that in order to designate a liquid substance an oil, it should have an unctiousness. On the other hand it was contended that the term "unctiousness" should only be applied to semisolids and that test was answered by the testimony of the defendant's experts, showing that banana oil, oil of mirvane, oil of turpentine, oil of wintergreen, oil of bitter almond and fusel oil are not unctious.

(b) The plaintiff's chemists also testified that in order to have an unctiousness a substance must have a greater viscosity than water and that anything which has the same viscosity as water could not be classified as an oil. This standard was combated by a series of tests measuring the viscosity of various oils and gasoline and comparing them with the viscosity of water. The test consisted in determining the number of seconds it would take for a given quantity of fluid to pass through an instrument known as the pipette. The time for water was five seconds. Two crude oils, Atlantic White Flash Gasoline and banana oil also each took five seconds. Three crude oils, four vegetable oils and two samples of kerosene each took six seconds. Four crude oils and fusel oil took seven seconds. One crude oil took 8, one took 9, oil of bergamot took 11 seconds. Glycerine took 285, and Atlantic

Medium Motor Oil took 288 seconds. So that the test applied by the expert of the plaintiff as to viscosity does not enable us to determine whether or not gasoline is oil.

(c) In determining whether gasoline is oil, the gasoline content of crude oil as it comes from the ground should have some weight. This ranges from 39.9 to 94 percent. The Light Refugio crude oil from Texas contains 94 percent and the Kettleman Hills crude oil from California contains 85 percent. If the crude oil as it comes from the ground is 94 percent gasoline it would stretch the processes of definition to hold that the other 6 percent should determine whether it is an oil and that the 94 percent should be eliminated in such determination.. This applies also down the line to the various proportions of gasoline content to the various crude oils.

(d) The scientific evidence on the subject leads very strongly to the conclusion that gasoline has been considered as an oil. In a number of the standard works, addresses and technical reports shown by defendant's exhibits nos. 44 to 52, inclusive, and 73 to 78, inclusive, gasoline has been described as an "oil", "colorless oil", or as a "light oil" obtained from distillation of crude petroleum. It is not necessary to quote at length from these exhibits. It is sufficient to say that they are persuasive.

(e) The experts called on behalf of the defendant all agree that in order to test whether a substance is an oil it must have four characteristics. It must be (1) a liquid; (2) insoluble in water; (3) soluble in ether; and (4) chemically combustible. We have so found in finding of fact no. 41. These experts all agree that from both technical knowledge and common experience gasoline must be considered an oil. Dr. Taylor sums it up as follows:

"For a wide variety of reasons it is one of the units in my classification of petroleum. . . . The light oil classification of petroleum. It is an oil, because of its use— usage, the usage of the term 'oil' in connection with gaso-

line in three different directions: in scientific work, in technological work, and in ordinary common everyday usage. I personally myself am predisposed to considering gasoline an oil because, being an Englishman in origin, I call gasoline 'petrol' when I am on the other side of the Atlantic, and 'petrol' so far as I am concerned, is rock oil. Because of its use in technology, in science, in ordinary everyday usage, I regard gasoline as an oil".

The words "kerosene" and "coal oil" have been interchangeably used. The plaintiff contends that kerosene is not an oil but in common acceptation it has long been called coal oil, and what are commercially known as oil stoves and oil lamps are the utensils used for burning kerosene. If kerosene can be regarded as an oil, and it certainly has been in the common acceptation of the term, there is only one step to be taken to regard gasoline as an oil because, in the process of distillation of crude petroleum, gasoline comes off as the first product and kerosene as the second. We predicate very little upon the argument that gasoline is not an oil because, in common parlance, if one went to a filling station and asked for gasoline he would not be given a lubricating oil. Or, if he asked for oil he would not be given a gasoline. The uses of the two things are so totally different that no one would expect to be furnished with lubricating oil when he asked for combustible gasoline. Moreover, coal oil and lubricating oil are both oils and of course an automobile operator who drove up to a gasoline station and ordered oil would not expect to have kerosene put into his engine, but it would be oil. Furthermore, a very large proportion of gasoline purchasers ask, in the vernacular, for "gas", knowing very well that they will get gasoline. So the argument is of little weight.

(f) Whatever may be said about the conclusion that gasoline is oil, drawn from either the scientific formula or the ordinary use of the term, we are not left in any uncertainty by the courts.

In Poe v. Humble Oil & Refining Co., 288 S. W. 264,

266 (Court of Civil Appeals of Texas, 1926) [reversed on other grounds 29 S. W. (2nd) 1019] it is said:

"Our courts, as well as the federal courts, have repeatedly held by the weight of authority in number, as well as in good reason, that casing-head gas or gasoline is oil [citing eight cases]. . . . .

"The courts will take judicial knowledge that casing-head gas or gasoline is oil [citing a number of authorities]. . . .

"In the light of the above authorities, we do not deem it necessary to enter into any argument as to whether or not gasoline is oil, but will accept the rule laid down in the above cases that gasoline is oil."

In Twin Hills Gasoline Co. v. Bradford Oil Corp. (D. C. Okla.) 264 Fed. 440, it is said:

"The evidence discloses that casing head gas is a component part of oil, that casing head gas is not made from dry gas, and that it is not a product of dry gas, but that it is a product of wet gas, and that wet gas exists only with oil. Therefore casing head gas is a component of oil."

In the following cases the courts of Texas have uniformly held that gasoline is oil: Livingston Oil Corp. v. Waggoner, 273 S. W. 903 (Court of Civil Appeals of Texas, 1925) ; Magnolia Petroleum Co. v. Aiken et al., 289 S. W. 152, 154 (Court of Civil Appeals of Texas, 1926,) ; Connellee et al. v. Magnolia Petroleum Co., 279 S. W. 597 (Court of Civil Appeals of Texas, 1925) ; Reynolds et al. v. McMan Oil & Gas Co. et al., 11 S. W. (2d) 778 (Commission of Appeals of Texas, 1928) ; Harris v. Lone Star Gas Co., 19 S. W. (2d) 178 (Court of Civil Appeals of Texas, 1929).

In Locke et al v. Russell et al., 75 W. Va. 602, 84 S. E. 948, it is held:

". . . gasoline is a colorless, inflammable fluid, the first and highest distillant of crude petroleum; represents the lightest portions of crude oil; and is extracted from it by distillation, very much as whiskey is distilled and in

much the same sort of apparatus. Americana. Being the most volatile component of petroleum, it readily separates from it, and, in the process of distillation, is the oil drawn off at the lowest temperature."

In Gilbreath v. States Oil Corp. (C. C. A., 5th Cir.), 4 F. (2d) 232, the court held, construing an oil and gas lease:

". . . the casing-head gas or gasoline must be considered as part of the oil since it partakes of the nature of that substance rather than what is ordinarily known as natural gas. It makes no difference that it is brought up in the form of vapor, or is extracted by artificial means. It forms the most important element of petroleum oil".

In The Kings County Fire Ins. Co. v. Swigert, 11 Ill. App. 590, 598, the court said:

"Crude petroleum consists of a number of different oils, all more or less volatile, which are separated from each other by a process of distillation, and of these, gasoline, being the most volatile, and consequently the most explosive, is the one driven off at the lowest temperature."

In Schroeder et ux. v. Gulf Refining Co. (No. 1), 300 Pa. 397, 400, Mr. Justice Sadler, in a trespass suit against the refining company, used language in describing the process involved in that case from which it may be inferred that he regarded gasoline as oil:

"Connection was then made with the wagon, and oil turned into the intake pipe, Hughes returning to the store while this transfer of fuel was taking place."

No case has been furnished nor have we found any in which it has been determined that gasoline is not within the generic definition of oil.

(g) It is vigorously argued that to designate gasoline as oil would be to read something into the Act of 1883 and its supplement of 1929 which was not intended by the legislature to be put there. This discussion refers to findings of fact 35, 36, 37. The independent refineries of Pennsylvania secured the passage of the Act

of 1883 for the purpose of transporting their crude and refined oils to the seaboard to meet the competition of the Standard Oil Company and save approximately one half the cost of such transportation. In Dryden v. Pittsburg Railway Co., 208 Pa. 316, 323, the court said, with reference to the construction of an act of assembly:

". . . it must be given its true intent and meaning in view of the circumstances which prompted its enactment . . .

"Courts will look into the occasion for the passage of such a statute (a remedial one) and consider the evils it seeks to remedy, their nature and extent to determine how far it was to reach".

In Provident Life & Trust Co. v. Klemmer et al., 257 Pa. 91, 93, the court said:

"In the construction of a statute, it is proper to consider the previous state of the law, the circumstances which led to the enactment, and especially the evil which it was designed to correct".

In Williams v. Rheas, Inc., 99 Pa. Superior Ct. 438, 442, the court said:

"The settled rule of interpretation, announced in the text-books and confirmed by judicial decision, is that when the words of the statute are not explicit, the intention is to be collected from the context, from the occasion and necessity of the law, from the mischief felt, and the object and remedy in view; and the intention is to be taken or presumed, according to what is consonant to reason and good discretion."

Applying these legal principles what was the mischief to be remedied? The Standard Oil Company had a monopoly in its pipe line. It is a well-known historical fact that monopolies at that time were not favored. The principal products of the independent refineries were kerosene and naphtha. Kerosene was of three grades. When the Act of 1883 gave the right of eminent domain to pipe lines for the transportation of oil or petroleum, could it be said that the transportation was limited to

crude oil? That would not have remedied the trouble. It would not have met the evil. In order to compete with the Standard Oil Company the pipe line transportation would necessarily have to be used for the refined petroleum products, and when the United Pipe Line Company was organized and laid its line it was used for refined oil.

It is also argued that because gasoline was not a commodity of great commercial use in 1883, it could not have been within the contemplation of the legislature that any pipe line incorporated pursuant to that act would transport gasoline. The Commonwealth urges that words in a statute are presumed to be used in their known and ordinary signification and that such popular import furnishes the rule for interpretation: Old Colony R. R. Co. v. Commissioner, 284 U. S. 552, 560; and artificial or scientific meanings should be avoided: Barber's Estate, 304 Pa. 235, 240. Statutes are to be given a prospective as well as a reasonable interpretation. They are not to be so construed as to impede governmental, commercial or economic progress: Cochranton Telephone Co. et al. v. Public Service Comm., 263 Pa. 506, 508, 70 Pa. Superior Ct. 212. Under this case and those which preceded it, cited in 70 Pa. Superior Ct. 216, it was held that notwithstanding telephone companies were not known when the Constitution of 1874 was passed, yet the Constitution and the Corporation Act of 1874 which mention telegraph companies include telephone companies and give to the latter the right of eminent domain. The reasoning of these cases is that "constitutions deal in general language and are not intended to provide merely for the exigencies of a few years", but to endure "through a long lapse" of time and because "telephony is viewed as a form of telegraphy" not only the constitutional provision mentioning telegraph companies included telephone companies but the Act of 1874 vesting the former, in terms, with the right of eminent domain also gives that right to the latter. Refined oil and gasoline are constituent parts

of crude oil. They come from crude oil, so it is not stretching a construction as much to hold that "oil or petroleum" includes both crude and refined, as it is to hold that "telephony is viewed as a form of telegraphy". Telephony was not known when the Act of 1874 was passed but refined petroleum products were known when the Act of 1883 was passed. If the word "telegraph" has the effect of bestowing the power of eminent domain on companies incorporated under the Act of 1874 certainly that power given to the pipe line companies to transport oil generally should include the refined products: See also Mitchell v. Public Service Comm. (No. 1), 80 Pa. Superior Ct. 120, 122. So this court has held that the fact that taxicabs were not known when the Act of 1889 was passed did not exclude taxicabs from being taxed under that statute: Commonwealth v. Quaker City Cab Co., 29 Dauph. 90, 94. Judge Frazer, in Commonwealth v. Hawkins, 14 Dist. R. 592, applied the same principle to the Act of 1868 authorizing cities to impose a license fee upon certain vehicles unknown when the act was passed. The mere fact that one refined product of crude oil or petroleum has displaced another to satisfy the commercial demands of the public would not justify the court in concluding that while the pipe line company might have the authority to transport kerosene because it was then a much used product, it could not now transport gasoline which has largely displaced kerosene in the public demand. Nor do we think that the fact that crude petroleum was not transported from east to west prior to 1928 throws any light upon this question. The Act of 1929 removed any limitation as to direction or source of supply and it was passed before the defendant was incorporated.

We are further of opinion that the Liquid Fuels Tax Acts of June 15, 1923, P. L. 834, June 29, 1923, P. L. 969, May 21, 1931, P. L. 149, and June 1, 1931, P. L. 298, imposing a tax on liquid fuels, and specifically designating all the liquid fuels whether from petroleum, natural

gas or vegetable ferments, offer no argument that the legislature, in 1883, did not intend to include gasoline within the terms "oil" or "petroleum".

Moreover, we cannot adopt the plaintiff's reasoning that gasoline was not intended to be included because it is a manufactured product. Illuminating oils such as kerosene and lubricating oils are also manufactured products. In our opinion the very purpose of the passage of the Act of 1883 was to provide pipe line shipments for kerosenes as well as crude petroleum. So that nothing can be predicated upon the fact that gasoline is a manufactured product.

3. The plaintiff contends that the defendant company is not a quasi-public corporation and therefore has no right to the exercise of the power of eminent domain. This discussion involves findings of fact 5, 16 to 29, inclusive, and 44 to 49, inclusive.

It is fundamental that the exercise of the power of eminent domain must be for a public use: Jacobs v. Clearview Water Supply Co., 220 Pa. 388, 393. It is also fundamental "that the control of the right of eminent domain rests with the legislature . . . and that the degree of the public necessity for the exercise of that right is exclusively for their ascertainment": Edgewood Railroad Company's Appeal, 79 Pa. 257, 269; Smedley v. Erwin et al., 51 Pa. 445, 450, 451. So the question as to whether pipe lines for the transportation of crude oil or petroleum and refined petroleum products should have the right of eminent domain is altogether a legislative question. "But whether the use to which it is sought to appropriate the property authorized to be taken, is a public use, is a judicial question for the determination of the courts": Philadelphia, Morton & Swarthmore Street Railway Company's Petition, 203 Pa. 354, 362; Sipe v. Tarentum Borough, 263 Pa. 338, 340, 341; St. Mary's Gas Co. v. Elk County et al., 191 Pa. 458, 461; Jacobs v. Clearview Water Supply Co., 220 Pa. 388, 393. In St. Mary's Gas Co. v. Elk County, supra, it is said: "Where use has been

declared to be public by the legislature the courts will hold it such unless the contrary clearly appears". It therefore appears that this court should not question the right of eminent domain conferred by the legislature on pipe line companies, particularly since that question has run the gamut of a large number of decisions in which the right of eminent domain conferred by the Act of June 2, 1883, P. L. 61, has been judicially recognized: Lehigh Valley Coal Co. v. United States Pipe Line Co., 3 Dist. R. 70, (1894); Sickler v. United States Pipe Line Co., 3 Dist. R. 62 (1894); Crescent Pipe Line Co., 2 Dist. R. 93 (1893); Bollinger v. Southern Pipe Line Co., 2 Dist. R. 604 (1893); Davis v. Southwest Pennsylvania Pipe Lines, 34 Pa. Superior Ct. 438 (1907), affirmed in 223 Pa. 56 (1909); Clement v. United States Pipe Line Co., 253 Pa. 187 (1916); Central R. R. Co. of N. J. v. United States Pipe Line Co., (E. D. Pa.) 290 Fed. 983 (1923); Commonwealth v. Southern Pipe Line Co., 1 D. & C. 616 (1922); Susquehanna Pipe Line Co. v. Sprenkle, 14 D. & C. 341 (1930). Moreover, the legislature has uniformly held that transportation generally is a public use and invested transportation companies with a right of eminent domain.

The question before us then is whether the defendant has built a pipe line for "public use". The words "public use" have been given no definition which can be of universal application.

In Pennsylvania Mutual Life Ins. Co. v. Philadelphia, 242 Pa. 47, 53, it is said:

"It has been held that the words are equivalent to public benefit or advantage. . . . Public use means the same as use by the public, and this it seems to us is the construction the words should receive in the constitutional provisions in question."

The court, in the case just cited, after discussing the two views whether "public use" means "a right of use by the public or some limited portion of the public", or whether the words "are equivalent to public utility or

advantage", determined that the former was the proper criterion. Twelfth Street Market Co. v. Philadelphia & Reading Terminal R. R. Co., 142 Pa. 580; McLeod v. Central Normal School, 152 Pa. 575, 585. In the last cited case it is said, page 584:

"The public is directly interested in the results to be produced by such corporations in the facilities afforded to travel, and the movements of trade and commerce".

The plaintiff insists that "public use" must be determined as indicated in the case of Williams et al. v. Standard Oil Co., 278 U. S. 235, 239, which involved the validity of a State statute fixing prices at which gasoline might be sold. It was held that the sale of gasoline was not so affected with the public interest as to sustain the statute. In that case it is said that the widespread use of gasoline does not determine whether the business is affected with a public interest. It is perhaps enough to say that the very recent case of Nebbia v. New York, 291 U. S. 502, 536, effectually disposes of the position taken in the case of Williams et al. v. Standard Oil Co. Mr. Justice Roberts said:

"The phrase 'affected with a public interest' can, in the nature of things, mean no more than that an industry, for adequate reason, is subject to control for the public good. In several of the decisions of this court wherein the expressions 'affected with a public interest,' and 'clothed with a public use,' have been brought forward as the criteria of the validity of price control, it has been admitted that they are not susceptible of definition and form an unsatisfactory test of the constitutionality of legislation directed at business practices or prices. These decisions must rest, finally, upon the basis that the requirements of due process were not met because the laws were found arbitrary in their operation and effect. But there can be no doubt that upon proper occasion and by appropriate measures the state may regulate a business in any of its aspects, including the

prices to be charged for the products or commodities it sells."

The cases cited for criticism in the above quotation include the case of Williams et al. v. Standard Oil Co., supra, and the cases relied upon in the opinion in the latter case. We definitely hold that there is no valid reason why the legislature cannot stamp the transportation of petroleum or refined petroleum products with a public interest.

The precise question which follows, then, is whether this pipe line company is maintaining a pipe line for "public use" so as to empower it to exercise the right of eminent domain because it is practically owned by the Atlantic Refining Company, has interlocking officers with the Atlantic Refining Company, occupies offices in the Atlantic Refining Company Building (however, at the usual rental for such offices), has not advertised itself to the public as a transportation company in any other way than by filing its tariffs and has, up to this time, received only the product of the Atlantic Refining Company for transportation. Over against this statement, however, it appears that there are 13 oil companies in the immediate vicinity of the intake pipe of the defendant company; that physical connection can readily be made between the facilities of these 13 companies and the pipe line of the defendant company; that the defendant company has a much larger capacity for transportation than is now used by the Atlantic Refining Company and that some preliminary negotiations were had between the Pure Oil Company, Gulf Refining Company and Standard Oil Company, with reference to the transportation of oil by the defendant through its pipe line for said companies, which negotiations were stopped by the filing of the petition in this case. It is a matter perhaps of history and certainly of common knowledge, that many of the large oil companies practically own pipe line companies and that the lines of the latter companies are used primarily for the transportation of the oil products

of the controlling company. It is a matter of history and we have found as a fact that the Act of June 2, 1883, P. L. 61, giving to pipe line companies the right of eminent domain, was passed for the very purpose of meeting the monopoly in pipe line transportation then held by the Standard Oil Company. As we have already indicated, the question of the right of eminent domain in these pipe line companies, thus controlled by oil companies, has heretofore been recognized by the courts. It is also a matter of common knowledge that the railroad companies have created and owned water companies primarily for the supplying of water to their engines where such facilities are required. One of such instances is found in Jacobs v. Water Supply Co., 220 Pa. 388. It is also a matter of common knowledge that some of the great industrial corporations own and operate small railroad lines. These situations have existed without question for a number of years. This use has not been heretofore attacked as not being a public use by pipe line companies which, although catering to one patron, hold themselves out by a proper system of tariffs to furnish service to such portion of the public as request it. The defendant company has the facility and the capacity for greater service than is required by the Atlantic Refining Company, its present patron, and within 30 days can equip itself to transport four or five times as much gasoline as it is now transporting. This company declared its intention to serve the public in its application to the Public Service Commission. There has been no instance in which it has declined its service to the public. We do not think that the case of Philadelphia Rural Transit Co. v. Philadelphia et al., 309 Pa. 84, relied upon by the plaintiff, is applicable to the present case. An entirely different kind of public use was in issue in that controversy.

In Jacobs v. Clearview Water Supply Co., 220 Pa. 388, 393, it is said:

"It is not essential that the whole community or any

considerable portion thereof, should directly enjoy or participate in an improvement, to make the use public. . . . An enterprise does not lose the character of a public use because that use may be limited by circumstances to a comparatively small part of the public".

In any event it may be said that while a great portion of the public is not dealing with the defendant company by furnishing its product for transportation a large portion of the public is being benefited in securing the commodity after it has been economically and efficiently transported.

In Rochester & Pittsburgh Coal and Iron Co. v. Berwind-White Coal Mining Co. et al., 24 Pa. C. C. 104, 108, it is said:

"But it does not follow that the use or benefit must be available to the whole public, or to any considerable portion of it. Nor that all persons must be benefited alike. The fact that the use may contribute largely to the advantage of some private enterprise does not detract from its public character. The general welfare of the people of the commonwealth is promoted by private business enterprises which develop the resources of the state and add to the general wealth and prosperity. Convenient and adequate means of transportation are essential to their existence, and the common carrier which supplies them with such means is serving a public interest and use, and not a private business enterprise".

It is not a controlling situation, certainly, in determining the character of a corporation, that practically all of the stock is held by one person or corporation. The nature of the business and not the stock ownership determines the status of the corporation: Pipe Line Cases, 234 U. S. 548; Meischke-Smith et al. v. Wardell, 286 Fed. 785; Camp Rincon Resort Co. et al. v. Eshelman et al., 172 Cal. 561, 158 Pac. 186; Commission, ex rel., v. Noble Mut. Tel. Co., 268 Ill. 411, 109 N. E. 298. For these reasons we conclude that the defendant corporation is not deprived of the right of eminent domain because of its

intimate association with the Atlantic Refining Company disclosed in the findings of fact.

4. Is the Commonwealth estopped by laches from securing a forfeiture of the rights acquired by the defendant in the exercise of the power of eminent domain? This discussion involves findings of fact 1 to 3, 5 to 18, 30 to 34, inclusive.

It needs no citation of authority to establish the proposition that the mere granting of a charter does not estop the Commonwealth from later questioning the activities of the corporation if engaged in some illegal work or exercising some power not conferred: Commonwealth, ex rel., v. American Baseball Club of Phila., 290 Pa. 136. So the issuance by the Public Service Commission of a certificate of public convenience would not vest in the corporation authority that it did not have: Wilson v. The Public Service Comm., 89 Pa. Superior Ct. 352; Westside Electric Street Railway Co. v. Public Service Comm., 91 Pa. Superior Ct. 162. Nor would the certificate of public convenience make the corporation a quasi-public one: Philadelphia Rural Transit Co. v. Philadelphia et al., 309 Pa. 84. But these authorities do not go to the extent of holding that under no circumstances can the Commonwealth be estopped from questioning the doing of a thing which it has not only approved but invited and encouraged.

In Commonwealth, ex rel., v. Bala & Bryn Mawr Turnpike Co., 153 Pa. 47, 53, it is said, with reference to the building of a turnpike under an amendment to a charter which authorized the company to extend its road:

"That decree stands unreversed and unappealed from, and under it, and in entire good faith, the defendant has made the extension of its road of which the commonwealth through its attorney general now complains. Upon the faith of this decree the defendant has expended a large amount of money without any warning on the part of the commonwealth of any objection on her part. The defendant company was acting under color of au-

thority, in pursuance of a decree of one of the commonwealth's own courts, and it seems ungracious on the part of the commonwealth after permitting the company to expend a large amount of money in extending their turnpike road to question years afterwards the regularity of the proceedings under which the expenditure was made. . . . It is true, the statute of limitations does not run against the commonwealth. But this is not a question of the statute of limitations. It is a question of laches, and laches may be imputed to the commonwealth as well as to an individual. . . . In England, from whence we derived the great body of common law, and most of our principles in equity, it is well settled that while time will not run against the crown, yet time, together with other elements, may make up a species of fraud and estop even sovereignty from exercising its legal rights."

This declaration that laches may be imputed to the Commonwealth has been repeated with approval in Pittsburgh Railways Co. et al. v. Borough of Carrick et al., 259 Pa. 333, 339, Pittsburgh v. Pittsburgh and West Va. Ry. Co. et al., 283 Pa. 196, 200, and Commonwealth, ex rel., v. Baker, 13 D. & C. 415. This is not a mere case of granting a charter and allowing the corporation to proceed to the exercise of what it regarded as its charter rights. Before these charter powers could be exercised it had to have the active approval of at least four of the agencies of the Commonwealth specially charged under the law with reference thereto. These approvals not only encouraged but practically invited the defendant company to do the thing which it did. The Secretary of the Commonwealth, the Public Service Commission, the Highway Department, the Water and Power Resources Board, each specifically examined and approved what the company proposed to do. If it be said that in the construction of the 226 miles of pipe line the approval of the Department of Highways for crossing the public highways in 293 places and the approval of the Water and Power Resources Board for crossing the streams of the Com-

monwealth in 107 places was merely perfunctory, no such suggestion can well be made as to the investigation of the Public Service Commission. That commission is established for the purpose of making, and it in fact makes, detailed investigations before it issues its certificates to proposed public service corporations. When the application for a charter was lodged with the Secretary of the Commonwealth, the Public Service Commission was asked for a certificate of public convenience and also for one authorizing the corporation to begin the exercise of the rights, powers, franchises and privileges. In those applications the fact that the corporation proposed to transport, by pipe line, petroleum and refined petroleum products, and the places where the line was to be constructed, were distinctly set out. After due notice and hearing the Public Service Commission issued its certificates, one of which avers:

"Full investigation of the matters and things involved having been had, the commission finds and determines that the granting of said petition is necessary and proper for the service, accommodation and convenience and safety of the public, and that a certificate of public convenience issue evidencing the commission's approval thereof".

The other avers:

"Full investigation of the matters and things involved having been had . . . the commission finds and determines that the approval of the beginning of the exercise of the Keystone Pipe Line Company of the rights and privileges of transporting, storing, insuring and shipping petroleum and refined petroleum products . . . is necessary and proper for the service, accommodation and convenience of the public".

Upon the receipt by the Secretary of the Commonwealth of such certificates, letters patent were issued. Thereupon $2,100,000 was spent. Eight hundred and thirty parcels of land were acquired for right-of-way easements, 140 of which were obtained by the exercise

of eminent domain, with three property owners objecting, two of whom have withdrawn their objections, Ben T. Welsh being now the only objecting property owner. The principles of equity are entwined into the whole fabric of the jurisprudence of this Commonwealth. The Commonwealth itself ought to observe those principles which it enjoins upon its citizens, and when it assumes a course of conduct which may amount to inequity against one of its citizens its conduct, in the language of Commonwealth v. Bala & Bryn Mawr Turnpike Co., supra, "may make up a species of fraud and estop even sovereignty from exercising its legal rights." It is true that the power of eminent domain is to be strictly construed. But it is also true that forfeitures are not favored. The incorporators of the defendant had knowledge that the Susquehanna Pipe Line Company had constructed 546.6 miles of pipe line at a cost of more than $5,000,000 without objection on the part of the Commonwealth or any of its officers, departments or commissions, and, acting upon such knowledge, were induced to incorporate the defendant company. The United States Pipe Line Company and the Tuscarora Oil Company operated pipe lines within the State when the defendant was incorporated. The attitude of the Commonwealth through its various agencies in approving the construction of the defendant's pipe line was more than a mere formal approval. It amounted to an invitation to do the thing that other corporations had successfully done without question and the defendant undertook to do it after approval by the Public Service Commission, pursuant to a full investigation and hearing. When the State establishes a commission to make a detailed investigation of the proposed operations of a public service company and that commission, after investigation, approves and the operations are not only begun but completed, the subsequent questioning of them and the forfeiture of charter rights because of them is a species of fraud perpetrated upon those who, in good faith, invest large sums of money on

the strength of such approval. The State ought not to engage in the perpetration of such constructive fraud. Moreover, time is not the only thing which should estop the Commonwealth. The perpetration of a constructive fraud should be equally effective to prevent the forfeiture of charter privileges which the State has deliberately bestowed. The Commonwealth contends that the court should not be solicitous about any loss the defendant would sustain because if the issue were decided in favor of the Commonwealth it would result only in a limited ouster of rights, inasmuch as only one property owner remains who contests. But even though only one petitioner moved the Attorney General the Commonwealth is challenging the whole right of the company which may seriously affect it.

While we repeat that the granting of a charter after the usual examination by the Secretary of the Commonwealth does not prevent the State from questioning the illegal use which may subsequently be made of a charter, yet we definitely hold in a case such as this, where the proposed charter powers and privileges are distinctly set out and are specifically investigated by departments and commissions of the State before they are allowed to be exercised and are only exercised pursuant to approval had after such investigation, that the Commonwealth is thereafter estopped from claiming that the exercise of those approved powers subjects the corporation to a forfeiture of them.

The Commonwealth's position overlooks the fact that a pipe line is a continuous operation. A break in it destroys its usefulness. If the defendant cannot cross one man's land it must relocate its line, perhaps at great expense. It would be absolutely impracticable to attempt to lay a pipe line if every parcel of property had to be purchased at the owner's price. Therefore the reason for conferring the right of eminent domain is not difficult to understand.

### Conclusions of law

1. The Act of June 2, 1883, P. L. 61, has not been repealed and is in full force and effect.

2. The Act of April 30, 1929, P. L. 896, is also in full force and effect.

3. The terms "petroleum" and "oil", as used in the Act of June 2, 1883, P. L. 61, include gasoline.

4. The transportation of petroleum or oil and gasoline by pipe line for the public is a public use.

5. The grant of the right of eminent domain to corporations organized for the purpose of transporting petroleum and oil for the public, contained in the Acts of June 2, 1883, P. L. 61, and April 30, 1929, P. L. 896, is a valid and constitutional exercise of police power.

6. The Keystone Pipe Line Company is a public service company.

7. The Keystone Pipe Line Company is a common carrier.

8. The Keystone Pipe Line Company is a quasi-public corporation and has the right of eminent domain.

9. The Commonwealth is estopped from obtaining a decree ousting the defendant from exercising the right to transport gasoline and other refined petroleum products through any part of its pipe line system which was constructed prior to January 16, 1933.

10. Judgment must be directed in favor of the defendant and the writ of quo warranto dismissed at the costs of the plaintiff.

### Decree

Now, April 5, 1934, the writ of quo warranto issued in the above-stated case is hereby dismissed, judgment is directed to be entered in favor of the defendant, at the costs of the plaintiff; exception to the plaintiff.

NOTE.—An appeal from the foregoing decree was taken to the Supreme Court of Pennsylvania but was nonprossed on May 27, 1935.